## MESCALERO APACHE TRIBE *v.* JONES, COMMISSIONER, BUREAU OF REVENUE OF NEW MEXICO, ET AL.

No. 71–738.   Argued December 12, 1972—Decided March 27, 1973

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and MARSHALL, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. DOUGLAS, J., filed an opinion dissenting in part, in which BRENNAN and STEWART, JJ., joined, *post,* p. 159.

*George E. Fettinger* argued the cause for petitioner. With him on the briefs was *F. Randolph Burroughs.*

*John C. Cook,* Assistant Attorney General of New Mexico, argued the cause for respondents. With him on the brief was *David L. Norvell,* Attorney General.*

---

*Briefs of *amici curiae* urging reversal were filed by *Solicitor General Griswold, Assistant Attorney General Frizzell, Harry R. Sachse, Carl Strass,* and *Eva R. Datz* for the United States; by *Arthur Lazarus, Jr., Philip P. Ashby, Royal D. Marks,* and *George P. Vlassis* for the Association on American Indian Affairs, Inc., et al.; by *David H. Getches* for the Native American Rights Fund; by *Samuel W. Murphy, Jr.,* and *William C. Pelster* for Montana Inter-

MR. JUSTICE WHITE delivered the opinion of the Court.

The Mescalero Apache Tribe operates a ski resort in the State of New Mexico, on land located outside the boundaries of the Tribe's reservation. The State has asserted the right to impose a tax on the gross receipts of the ski resort and a use tax on certain personalty purchased out of State and used in connection with the resort. Whether paramount federal law permits these taxes to be levied is the issue presented by this case.

The home of the Mescalero Apache Tribe is on reservation lands in Lincoln and Otero Counties in New Mexico. The Sierra Blanca Ski Enterprises, owned and operated by the Tribe, is adjacent to the reservation and was developed under the auspices of the Indian Reorganization Act of 1934, 48 Stat. 984, as amended, 25 U. S. C. § 461 et seq.[1] After a feasibility study by the Bureau of Indian Affairs, equipment and construction money was provided by a loan from the Federal Government under § 10 of the Act, 25 U. S. C. § 470, and the necessary land was leased from the United States Forest Service for a term of 30 years. The ski area borders on the Tribe's reservation but, with the exception of some cross-country ski trails, no part of the enterprise, its buildings, or equipment is located within the existing boundaries of the reservation.

The Tribe has paid under protest $26,086.47 in taxes to the State, pursuant to the sales tax law, N. M. Stat.

Tribal Policy Board; and by *Raymond C. Simpson* for Agua Caliente Band of Mission Indians.

*William D. Dexter,* Assistant Attorney General of Washington, and *Eugene F. Corrigan* filed a brief for Multistate Tax Commission as *amicus curiae* urging affirmance.

[1]In 1936, the Tribe adopted a constitution, pursuant to § 16 of the Act, 25 U. S. C. § 476.

Ann. § 72–16–1 *et seq.* (1953), based on the gross receipts of the ski resort from the sale of services and tangible property.[2] In addition, in 1968 the State assessed compensating use taxes against the Tribe in the amount of $5,887.19 (plus penalties and interest), based on the purchase price of materials used to construct two ski lifts at the resort. N. M. Stat. Ann. § 72–17–1 *et seq.* (1953). The Tribe duly protested the use tax assessment and sought a refund of the sales taxes paid. The State Commissioner of Revenue denied both the claim for refund and the protest of assessment and the Court of Appeals of the State affirmed. The court held, essentially, that the State had authority to apply its nondiscriminatory taxes to the Tribe's enterprise and property involved in the dispute, and that the Indian Reorganization Act did not render the Tribe's enterprise a federal instrumentality, constitutionally immune from state taxation, nor did it, by its own terms, grant immunity from the taxes here involved. 83 N. M. 158, 489 P. 2d 666 (1971). The Supreme Court of New Mexico denied certiorari. 83 N. M. 151, 489 P. 2d 659 (1971). We granted the Tribe's petition for a writ of certiorari, 406 U. S. 905, to consider its claim that the income and property of the ski resort are not properly subject to state taxation. We affirm in part and in part reverse.

I

At the outset, we reject—as did the state court—the broad assertion that the Federal Government has exclusive jurisdiction over the Tribe for all purposes and that the State is therefore prohibited from enforcing its revenue laws against any tribal enterprise "[w]hether

---

[2] The Tribe asserts that "no sales tax (gross receipts tax) is being . . . charged for any ski rentals, lift tickets, food or beverages."

the enterprise is located on or off tribal land." [3]   General-
izations on this subject have become particularly treach-
erous.   The conceptual clarity of Mr. Chief Justice Mar-
shall's view in *Worcester* v. *Georgia,* 6 Pet. 515, 556–
561 (1832), has given way to more individualized treat-
ment of particular treaties and specific federal statutes,
including statehood enabling legislation, as they, taken
together, affect the respective rights of States, Indians,
and the Federal Government.   See *McClanahan* v. *Ari-
zona State Tax Comm'n, post,* p. 164; *Organized Village
of Kake* v. *Egan,* 369 U. S. 60, 71–73 (1962).   The upshot
has been the repeated statements of this Court to the
effect that, even on reservations, state laws may be ap-
plied unless such application would interfere with reser-
vation self-government or would impair a right granted
or reserved by federal law.   *Organized Village of Kake,
supra,* at 75; *Williams* v. *Lee,* 358 U. S. 217 (1959);
*New York ex rel. Ray* v. *Martin,* 326 U. S. 496, 499
(1946); *Draper* v. *United States,* 164 U. S. 240 (1896).
Even so, in the special area of state taxation, absent ces-
sion of jurisdiction or other federal statutes permitting
it, there has been no satisfactory authority for taxing
Indian reservation lands or Indian income from activities
carried on within the boundaries of the reservation, and
*McClanahan* v. *Arizona State Tax Comm'n, supra,* lays
to rest any doubt in this respect by holding that such
taxation is not permissible absent congressional consent.

But tribal activities conducted outside the reserva-
tion present different considerations.   "State authority
over Indians is yet more extensive over activities . . .
not on any reservation."   *Organized Village of Kake,
supra,* at 75.   Absent express federal law to the contrary,
Indians going beyond reservation boundaries have gen-

---

[3] Brief for Petitioner 16.

erally been held subject to nondiscriminatory state law otherwise applicable to all citizens of the State. See, e. g., *Puyallup Tribe* v. *Department of Game,* 391 U. S. 392, 398 (1968); *Organized Village of Kake, supra,* at 75–76; *Tulee* v. *Washington,* 315 U. S. 681, 683 (1942); *Shaw* v. *Gibson-Zahniser Oil Corp.,* 276 U. S. 575 (1928); *Ward* v. *Race Horse,* 163 U. S. 504 (1896). That principle is as relevant to a State's tax laws as it is to state criminal laws, see *Ward* v. *Race ·Horse, supra,* at 516, and applies as much to tribal ski resorts as it does to fishing enterprises. See *Organized Village of Kake, supra.*

The Enabling Act for New Mexico, 36 Stat. 557,[4] reflects the distinction between on- and off-reservation activities. Section 2 of the Act provides that the people of the State disclaim "all right and title" to lands "owned or held by any Indian or Indian tribes the right or title to which shall have been acquired through or from the United States . . . and that . . . the same shall be and remain subject to the disposition and under the absolute jurisdiction and control of the Congress of the United States." But the Act expressly provides, with respect to taxation, that "nothing herein . . . shall preclude the said State from taxing, as other lands and other property are taxed, any lands and other property outside of an Indian reservation owned or held by any Indian, save and except such lands as have been granted . . . or as may be granted or confirmed to any Indian or Indians under any Act of Congress, but . . . all such lands shall be exempt from taxation by said State [only] so long and to such extent as Congress has prescribed or may hereafter prescribe." It is thus clear that in terms of general power New Mexico retained the right to tax, unless Congress forbade it,

---

[4] A corresponding provision appears in the Constitution of the State of New Mexico, Art. XXI, § 2.

all Indian land and Indian activities located or occurring "outside of an Indian reservation." [5]

We also reject the broad claim that the Indian Reorganization Act of 1934 rendered the Tribe's off-reservation ski resort a federal instrumentality constitutionally immune from state taxes of all sorts. *M'Culloch* v. *Maryland*, 4 Wheat. 316 (1819). The intergovernmental-immunity doctrine was once much in vogue in a variety of contexts and, with respect to Indian affairs, was consistently held to bar a state tax on the lessees of, or the product or income from, restricted lands of tribes or individual Indians. The theory was that a federal instrumentality was involved and that the tax would interfere with the Government's realizing the maximum return for its wards. This approach did not survive; its rise and decline in Indian affairs is described and reflected in *Helvering* v. *Mountain Producers Corp.*, 303 U. S. 376 (1938); *Oklahoma Tax Comm'n* v. *United States*, 319 U. S. 598 (1943); and *Oklahoma Tax Comm'n* v. *Texas Co.*, 336 U. S. 342 (1949), where the Court cut to the bone the proposition that restricted Indian lands and the proceeds from them were—as a matter of constitutional law—automatically exempt from state taxation. Rather, the Court held that Congress has the power "to immunize these lessees from the taxes we think the Constitution permits Oklahoma to impose in the absence of such action" and that "[t]he question whether immunity shall be extended in situations like these is essentially legislative in character." *Oklahoma Tax Comm'n* v. *Texas Co.*, *supra*, at 365–366.

---

[5] The Tribe's treaty with the United States, 10 Stat. 979, which acknowledges that the Tribe is "exclusively under the laws, jurisdiction, and government of the United States . . . ," does not alter the obvious effect of the State's admission legislation. See, *e. g.*, *Organized Village of Kake* v. *Egan*, 369 U. S. 60, 67–68 (1962), and cases cited therein.

The Indian Reorganization Act of 1934 neither requires nor counsels us to recognize this tribal business venture as a federal instrumentality. Congress itself felt it necessary to address the immunity question and to provide tax immunity to the extent it deemed desirable. There is, therefore, no statutory invitation to consider projects undertaken pursuant to the Act as federal instrumentalities generally and automatically immune from state taxation. Unquestionably, the Act reflected a new policy of the Federal Government and aimed to put a halt to the loss of tribal lands through allotment. It gave the Secretary of the Interior power to create new reservations, and tribes were encouraged to revitalize their self-government through the adoption of constitutions and bylaws and through the creation of chartered corporations, with power to conduct the business and economic affairs of the tribe.[6] As was true in the case before us, a tribe taking advantage of the Act might generate substantial revenues for the education and the social and economic welfare of its people.[7] So viewed, an enterprise such as the ski resort in this case serves a federal function with respect to the Government's role in Indian affairs. But the "mere fact that property is used, among others, by the United States as an instrument for effecting its purpose does not relieve it from state taxation." *Choctaw, Oklahoma & Gulf R. Co.* v. *Mackey*, 256 U. S. 531, 536 (1921). See also *Henderson Bridge Co.* v. *Kentucky*, 166 U. S. 150, 154 (1897).

---

[6] See generally U. S. Dept. of the Interior, Federal Indian Law 129–132 (1958), a revision of Handbook of Federal Indian Law, prepared under the editorial direction of Felix S. Cohen, first printed in 1940 (hereinafter Federal Indian Law); Comment, Tribal Self-Government and the Indian Reorganization Act of 1934, 70 Mich. L. Rev. 955 (1972).

[7] For other examples see Comment, n. 6, *supra*, at 983–985. See also J. Collier, On the Gleaming Way 149, 129–149 (1962).

152

The intent and purpose of the Reorganization Act was "to rehabilitate the Indian's economic life and to give him a chance to develop the initiative destroyed by a century of oppression and paternalism." H. R. Rep. No. 1804, 73d Cong., 2d Sess., 6 (1934). See also S. Rep. No. 1080, 73d Cong., 2d Sess., 1 (1934). As Senator Wheeler, on the floor, put it:

> "This bill . . . seeks to get away from the bureaucratic control of the Indian Department, and it seeks further to give the Indians the control of their own affairs and of their own property; to put it in the hands either of an Indian council or in the hands of a corporation to be organized by the Indians." 78 Cong. Rec. 11125.

Representative Howard explained that:

> "The program of self-support and of business and civic experience in the management of their own affairs, combined with the program of education, will permit increasing numbers of Indians to enter the white world on a footing of equal competition." *Id.*, at 11732.[8]

The Reorganization Act did not strip Indian tribes and their reservation lands of their historic immunity from state and local control.[9] But, in the context of the Re-

---

[8] See also *id.*, at 11727, 11731–11732 (remarks of Rep. Howard); the statements of Mr. John Collier, the Commissioner of Indian Affairs, in Hearings on H. R. 7902, before the House Committee on Indian Affairs, 73d Cong., 2d Sess., 37, 60, 65–67 (1934) (hereinafter 1934 House Hearings).

[9] The predecessor bills to the Wheeler-Howard Act, H. R. 7902 and S. 2755 (respectively 78 Cong. Rec. 2437 and 2440), expressly provided that the chartered Indian communities may act "as a Federal agency in the administration of Indian Affairs," and, correspondingly, that the United States would not "be liable for any act done . . . by a chartered Indian community." Title I,

organization Act, we think it unrealistic to conclude that Congress conceived of off-reservation tribal enterprises "virtually as an arm of the Government." *Department of Employment* v. *United States,* 385 U. S. 355, 359–360 (1966). Cf. *Clallam County* v. *United States,* 263 U. S. 341 (1923). On the contrary, the aim was to disentangle the tribes from the official bureaucracy. The Court's decision in *Organized Village of Kake, supra,* which involved tribes organized under the Reorganization Act, demonstrates that off-reservation activities are within the reach of state law. See also *Puyallup Tribe,* 391 U. S., at 398. What was said in *Shaw* v. *Gibson-Zahniser Oil Corp.,* 276 U. S. 575 (1928), is relevant here. At issue there was the taxability of off-reservation Indian land purchased with consent of the Secretary of the Interior with the accumulated royalties from the in-

---

§ 4 (i). 1934 House Hearings 3. The bills further provided that: "Nothing in this Act shall be construed as rendering the property of any Indian community . . . subject to taxation by any State or subdivision thereof . . . ." Tit. I, § 11. *Id.,* at 5. The memorandum of John Collier, which accompanied the bills, stated that "[a]s a Federal agency, the property of a chartered community is constitutionally exempt from State taxation . . . ." *Id.,* at 25. These extensive provisions for tax immunity were discarded in the Wheeler-Howard Act, along with the accompanying provisions for more extensive governmental powers on the part of the chartered communities. See H. R. Rep. No. 1804, *supra,* at 6. We do not read this legislative history, however, as suggesting that Congress intended to remove the traditional tax immunity that Indian tribes enjoyed on their reservations. This reading finds support in Felix S. Cohen's treatise, see Federal Indian Law 852–853, although we believe that the broader thrust of his statement—that any "attempt by a State to impose income or other types of taxes" upon "tribal corporations organized under the Indian Reorganization Act . . . would still be held a direct burden on a Federal instrumentality"—is not supported by the modern cases and should be read with and in the light of other discussions of the immunity doctrine in particularized contexts. See *id.,* at 872–873, 864–873.

dividual Indian's restricted allotted lands. Alienation of the purchased land was federally restricted. In rejecting a claim that state taxation of the land was barred by the federal-instrumentality doctrine,[10] the then Mr. Justice Stone wrote for a unanimous Court:

> "What governmental instrumentalities will be held free from state taxation, though Congress has not expressly so provided, cannot be determined apart from the purpose and character of the legislation creating them. . . .
>
> .      .      .      .      .
>
> "The early legislation affecting the Indians had as its immediate object the closest control by the government of their lives and property. The first and principal need then was that they should be shielded alike from their own improvidence and the spoliation of others but the ultimate purpose was to give them the more independent and responsible status of citizens and property owners. . . .
>
> .      .      .      .      .
>
> "In a broad sense all lands which the Indians are permitted to purchase out of the taxable lands of the state in this process of their emancipation and assumption of the responsibility of citizenship, whether restricted or not, may be said to be instrumentalities in that process. But . . . [t]o hold them immune would be inconsistent with one of the

---

[10] The claim of tax immunity was made by a non-Indian lessee, under the rule of *Gillespie* v. *Oklahoma*, 257 U. S. 501 (1922), which was itself overruled in *Oklahoma Tax Comm'n* v. *Texas Co.*, 336 U. S. 342 (1949), over two decades after *Shaw*. As a decision with respect to constitutionally mandated intergovernmental immunity, *Shaw* remains good law, although its result was altered by statute, as Congress was free to do. See generally *Board of County Comm'rs* v. *Seber*, 318 U. S. 705 (1943).

very purposes of their creation, to educate the Indians in responsibility . . . ." *Id.,* at 578–581.

We accordingly decline the invitation to resurrect the expansive version of the intergovernmental-immunity doctrine that has been so consistently rejected in modern times.

## II

The Tribe's broad claims of tax immunity must therefore be rejected. But there remains to be considered the scope of the immunity specifically afforded by § 5 of the Indian Reorganization Act. 25 U. S. C. § 465.

## A

Section 465 provides, in part, that "any lands or rights acquired" pursuant to any provision of the Act "shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired, and such lands or rights shall be exempt from State and local taxation." [11] On its face, the statute exempts land and rights in land, not income derived from its use. It is true that a statutory tax exemption for "lands" may, in light of its context and purposes, be con-

---

[11] The ski resort land was not technically "acquired" "in trust for the Indian tribe." But, as the Solicitor General has pointed out, "it would have been meaningless for the United States, which already had title to the forest, to convey title to itself for the use of the Tribe." Brief for the United States as *amicus curiae* 13. We think the lease arrangement here in question was sufficient to bring the Tribe's interest in the land within the immunity afforded by § 465. It should perhaps be noted that the Tribe has not suggested that it is immune from taxation by virtue of its status as a lessee of land owned by the Federal Government. See, *e. g., United States* v. *Detroit,* 355 U. S. 466 (1958); *James* v. *Dravo Contracting Co.,* 302 U. S. 134 (1937); cf. *Helvering* v. *Mountain Producers Corp.,* 303 U. S. 376 (1938); *Oklahoma Tax Comm'n* v. *Texas Co., supra.*

strued to support an exemption for taxation on income derived from the land. See *Squire* v. *Capoeman,* 351 U. S. 1 (1956); cf. *Superior Bath House Co.* v. *McCarroll,* 312 U. S. 176 (1941).[12]  But, absent clear statutory guidance, courts ordinarily will not imply tax exemptions and will not exempt off-reservation income from tax simply because the land from which it is derived, or its other source, is itself exempt from tax.

"This Court has repeatedly said that tax exemptions are not granted by implication. . . . It has applied that rule to taxing acts affecting Indians as to all others. . . . If Congress intends to prevent the State of Oklahoma from levying a general non-discriminatory estate tax applying alike to all its citizens, it should say so in plain words. Such a conclusion cannot rest on dubious inferences." *Oklahoma Tax Comm'n* v. *United States,* 319 U. S., at 606–607.  See *Squire* v. *Capoeman, supra,* at 6.  Absent a "definitely expressed" exemption, an Indian's royalty income from Indian oil lands is subject to the federal income tax although the source of the income may be exempt from tax.  *Choteau* v. *Burnet,* 283 U. S. 691, 696–697 (1931).

---

[12] *Squire* v. *Capoeman* involved the attempted imposition of federal capital gains taxes on the sale price of timber logged off allotted Indian timberland (located within a reservation).  The timber constituted "the major value"—if not the only practical value—of the Indian's allotted land and it was clear that if the capital gains tax was to apply, the purposes and intent of the General Allotment Act of 1887 would in large measure have been frustrated.  351 U. S., at 10.  The Court, relying in part on "relatively contemporaneous official and unofficial writings" on the intended scope of the income tax laws, *id.,* at 9, declined to so interpret those later enacted laws and to find that the Government intended to tax its own ward in this particular manner.  In contrast to *Squire,* we find nothing fundamentally inconsistent with the intent of the Indian Reorganization Act in permitting the gross receipts of the Tribe's off-reservation enterprise to be subject to nondiscriminatory state taxes.

The Court has also held that a State, as well as the Federal Government, may tax an Indian's pro rata share of income from a tribe's restricted mineral resources. *Leahy* v. *State Treasurer,* 297 U. S. 420 (1936). Lessees of otherwise exempt Indian lands are also subject to state taxation. *Oklahoma Tax Comm'n* v. *Texas Co.,* 336 U. S. 342 (1949).

On the face of § 465, therefore, there is no reason to hold that it forbids income as well as property taxes. Nor does the legislative history support any other conclusion. As we have noted, several explicit provisions encompassing a broad tax immunity for chartered Indian communities were dropped from the bills that preceded the Wheeler-Howard bill. See n. 9, *supra.* Similarly, the predecessor to the exemption embodied in § 465 dealt only with lands acquired for new reservations or for additions to existing reservations. 1934 House Hearings 11. Here, the rights and land were acquired by the Tribe beyond its reservation borders for the purpose of carrying on a business enterprise as anticipated by §§ 476 and 477 of the Act.[13] These provisions were designed to encourage tribal enterprises "to enter the white world on a footing of equal competition." 78 Cong. Rec. 11732. In this context, we will not imply an expansive immunity from ordinary income taxes that businesses throughout the State are subject to. We therefore

---

[13] It is unclear from the record whether the Tribe has actually incorporated itself as an Indian chartered corporation pursuant to § 477. But see Charters, Constitutions and By-Laws of the Indian Tribes of North America, pt. III, pp. 13–15 (G. Fay ed. 1967). The Tribe's constitution, however, adopted under 25 U. S. C. § 476, gives its Tribal Council the powers that would ordinarily be held by such a corporation, Art. XI, and by both practice and regulations, the two entities have apparently merged in important respects. See 25 CFR § 91.2; Comment, n. 6, *supra,* at 973. In any event, the question of tax immunity cannot be made to turn on the particular form in which the Tribe chooses to conduct its business.

hold that the exemption in § 465 does not encompass or bar the collection of New Mexico's nondiscriminatory gross receipts tax and that the Tribe's ski resort is subject to that tax.

## B

We reach a different conclusion with respect to the compensating use tax imposed on the personalty installed in the construction of the ski lifts. According to the Stipulation of Facts, that personal property has been "permanently attached to the realty." In view of § 465, these permanent improvements on the Tribe's tax-exempt land would certainly be immune from the State's ad valorem property tax. See *United States* v. *Rickert,* 188 U. S. 432, 441–443 (1903). We think the same immunity extends to the compensating use tax on the property. The jurisdictional basis for use taxes is the use of the property in the State. See *Henneford* v. *Silas Mason Co.,* 300 U. S. 577 (1937); *McLeod* v. *J. E. Dilworth Co.,* 322 U. S. 327, 330 (1944). It has long been recognized that "use" is among the "bundle of privileges that make up property or ownership" of property and, in this sense at least, a tax upon "use" is a tax upon the property itself. *Henneford* v. *Silas Mason Co., supra,* at 582. This is not to say that use taxes are for all purposes to be deemed simple ad valorem property taxes. See, *e. g., United States* v. *Detroit,* 355 U. S. 466 (1958), and its companion cases; *Sullivan* v. *United States,* 395 U. S. 169 (1969). But use of permanent improvements upon land is so intimately connected with use of the land itself that an explicit provision relieving the latter of state tax burdens must be construed to encompass an exemption for the former. "Every reason that can be urged to show that the land was not subject to local taxation applies to

the assessment and taxation of the permanent improvements." *United States* v. *Rickert, supra,* at 442.

The judgment of the Court of Appeals is

*Affirmed in part and reversed in part.*

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BRENNAN and MR. JUSTICE STEWART concur, dissenting in part.

The power of Congress granted by Art. I, § 8 "[t]o regulate Commerce . . . with the Indian Tribes" is an exceedingly broad one. In the liquor cases the Court held that it reached acts even off Indian reservations in areas normally subject to the police power of the States. *Perrin* v. *United States,* 232 U. S. 478. The power gained breadth by reason of historic experiences that induced Congress to treat Indians as wards of the Nation. See *Gritts* v. *Fisher,* 224 U. S. 640, 642–643; *United States* v. *Thomas,* 151 U. S. 577, 585; *United States* v. *McGowan,* 302 U. S. 535, 538. The laws enacted by Congress varied from decade to decade. See U. S. Dept. of the Interior, Federal Indian Law 94–138 (1958), which is a revision of the monumental work, Handbook of Federal Indian Law prepared by Felix S. Cohen and published in 1940.

The present Act, 48 Stat. 984, 25 U. S. C. § 461 *et seq.,* was enacted in 1934 with various purposes in mind, the ones most relevant being, first, "[t]o permit Indian tribes to equip themselves with the devices of modern business organization, through forming themselves into business corporations," and second, "[t]o establish a system of financial credit for Indians." S. Rep. No. 1080, 73d Cong., 2d Sess., 1.

Loans had been made by the federal agency to individual Indians, but the experience had not been satisfactory. *Id.,* at 3–4. The 1934 Act precluded such loans and set up a $10 million revolving-credit fund for loans

to incorporated tribes. The industry established pursuant to that Act and involved here is a ski enterprise, adjacent to the reservation and located on lands leased from the U. S. Forest Service.

The Court makes much of the fact that the ski enterprise is not on the reservation. But that seems irrelevant to me by reason of § 5 of the Act, which provides in part that "any lands or rights acquired" pursuant to the 1934 Act "shall be taken in the name of the United States in trust for the Indian tribe . . . for which the land is acquired, and such lands or rights shall be exempt from State and local taxation." 25 U. S. C. § 465. While the lease of Forest Service lands was not technically "acquired . . . in trust for the Indian tribe," the Court concedes that the lease arrangement was sufficient to bring the Tribe's interest in the land within the immunity afforded by § 465. And so the question respecting income taxes comes down to whether these taxes are within the scope of "such lands or rights" as used in § 5.

I start from the premise made explicit in the Senate Report on the 1934 Act. It set forth the endorsement by President Roosevelt of "a new standard of dealing between the Federal Government and its Indian wards." S. Rep., *supra*, at 3. Article 10 of the 1852 Treaty with the Apaches described the role of the guardian as respects these wards: "For and in consideration of the faithful performance of all the stipulations herein contained, by the said Apache's Indians, the government of the United States will grant to said Indians such donations, presents, and implements, and adopt such other liberal and humane, measures as said government may deem meet and proper." 10 Stat. 980.

The 1934 Act obviously is an effort by Congress to extend its control to Indian economic activities outside the reservation for the benefit of its Indian wards. The philosophy permeating the present Act was articulated

by Mr. Chief Justice Marshall in *Worcester* v. *Georgia,* 6 Pet. 515, 556:

> "From the commencement of our government, Congress has passed acts to regulate trade and intercourse with the Indians; which treat them as nations, respect their rights, and manifest a firm purpose to afford that protection which treaties stipulate."

As noted in *Warren Trading Post* v. *Tax Comm'n,* 380 U. S. 685, most tax immunities of Indians have related to activities in reservations. But, as we stated in that case, the fact that the activities occurred on a reservation was not the controlling reason, "but rather because Congress in the exercise of its power granted in Art. I, § 8, has undertaken to regulate reservation trading in such a comprehensive way that there is no room for the States to legislate on the subject." *Id.,* at 691 n. 18.

The powers of Congress "over Indian affairs are as wide as State powers over non-Indians," subject, of course, to the limitations of the Bill of Rights. Federal Indian Law 24. One illustration of its extent is shown by the liquor cases already cited. We deal here, however, with "tribal property"—a leasehold interest in federal lands adjoining the reservation. "The term *tribal property* . . . does not designate a single and definite legal institution, but rather a broad range within which important variations exist." Federal Indian Law 590–591. There is no magic in the word "reservation." *United States* v. *McGowan, supra,* held that land purchased by Congress for a tribe but outside a "reservation" was nonetheless "Indian country." While that case involved application of liquor laws, the Court stated that "Congress alone has the right to determine the manner in which this country's guardianship over the Indians shall be

carried out," *id.*, at 538, and that it was immaterial what the tract of the land was called. *Id.*, at 539.

In the present case, Congress has attempted to give this tribe an economic base which offers job opportunities, a higher standard of living, community stability, preservation of Indian culture, and the orientation of the tribe to commercial maturity. We deal only with a tribal-developed enterprise. State taxation of that enterprise interferes with the federal project. The ski resort, being a federal tool to aid the tribe, may not be taxed by the State without the consent of Congress. Congress by § 5 of the Act has made the "lands or rights" acquired for the tribe exempt from state and local taxation. Section 5, indeed, states that "lands or rights" acquired under the 1934 Act shall be held "in trust for the Indian tribe or individual Indian for which the land is acquired." There is no more convincing way to tax "rights" in land than to impose an income tax on the gross or net income from those rights. If § 5 be thought to be ambiguous, we should resolve the ambiguity in favor of the tribe. As stated in *Carpenter* v. *Shaw*, 280 U. S. 363, 367, "Doubtful expressions are to be resolved in favor of the weak and defenseless people who are the wards of the nation, dependent upon its protection and good faith." In *Squire* v. *Capoeman*, 351 U. S. 1, we resolved doubts respecting the federal income tax in favor of the Indian. There is the same reason for taking that course here.

The tribal ski enterprise, unlike the private entrepreneur in *Helvering* v. *Mountain Producers Corp.*, 303 U. S. 376, on which the Court relies, is plainly a federal instrumentality—authorized and financed by Congress with the aim of starting the tribe on commercial ventures. This case has no relation to *Oklahoma Tax Comm'n* v. *United States*, 319 U. S. 598, which raised the question whether state inheritance taxes could be levied on re-

stricted property. The Court only held that restricted property, as created by Congress, carried no implication of estate tax exemption. *Oklahoma Tax Comm'n* v. *Texas Co.*, 336 U. S. 342, also relied on by the Court, merely held that a lessee of mineral rights in Indian lands was not immunized from paying state gross production taxes and state excise taxes on petroleum produced from the lands. Those cases would be relevant here if the tribe had leased the ski resort to an outsider who sought the tribal tax immunity. We deal only with an income tax levied on a tribal corporate enterprise conducted by the tribe with federal funds on federal lands leased to the tribe. Federal Indian Law distinguished the *Helvering* and like cases relied on by the Court from an enterprise "organized solely to carry out governmental objectives, such as the tribal corporations organized" under the 1934 Act with which we now deal, *id.*, at 852–853.

In my view, this state income tax is barred by § 5 through which Congress has given tax immunity to these new tribal enterprises.