Robert E. SAGE, Plaintiff
and Appellant,

v.

SICANGU OYATE HO, INC., d/b/a St. Francis Indian School, Defendant and Appellee.

No. 17306.

Supreme Court of South Dakota.

Argued April 22, 1991.

Decided July 24, 1991.

Donald E. Covey, Covey Law Office, Winner, for plaintiff and appellant.

Terry L. Pechota, Finch, Viken, Viken and Pechota, Rapid City, for defendant and appellee.

SABERS, Justice.

Non–Indian principal of school on Indian reservation appeals dismissal of his employment grievance by circuit court for lack of subject matter jurisdiction.

### Facts

Sicangu Oyate Ho, Inc.[1] is a nonprofit corporation which operates St. Francis Indian School (school) on the Rosebud Sioux Indian Reservation. Sage, a non-Indian, was employed under contract by school as teacher or high school principal continuously from 1979 to 1990. On February 13, 1990, school first notified Sage in writing of its intent not to renew his contract for the upcoming 1990–91 school year. Following further correspondence between school and Sage, school informed him on April 10, 1990 that its decision not to renew was final.

1. Voice of the Burnt Thigh People, Inc.

On May 30, 1990, Sage filed in state circuit court a notice of appeal of school's decision not to renew his contract pursuant to SDCL ch. 13–43 and 13–46. School filed a special appearance with motion to dismiss on grounds of lack of subject matter jurisdiction. Circuit court granted school's motion to dismiss on August 6, 1990, finding lack of jurisdiction under two theories:

(1) infringement of tribal sovereignty and

(2) federal preemption.

The sole issue is whether the circuit court erred in finding that it lacked subject matter jurisdiction over Sage's cause of action.

### Infringement and Preemption

■ There are two distinct barriers to a state's assumption of jurisdiction over reservation Indians: "infringement" and "preemption." Although "either [barrier], standing alone, can be a sufficient basis for holding state law inapplicable to activity undertaken on the reservation or by tribal members," we consider them together because "[t]hey are related[.]" *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 143, 100 S.Ct. 2578, 2583, 65 L.Ed.2d 665 (1980).

■ Infringement refers to the original sovereignty of Indian tribes apart from the recognition of same by the federal government. "It must always be remembered that the various Indian tribes were once independent and sovereign nations, and that their claim to sovereignty long predates that of our own Government." *McClanahan v. Arizona Tax Comm'n*, 411 U.S. 164, 172, 93 S.Ct. 1257, 1262, 36 L.Ed.2d 129 (1973). Therefore, even when an assertion of state jurisdiction over reservation Indians is not expressly preempted by federal law to the contrary, "the question has always been whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them." *Williams v. Lee*, 358 U.S. 217, 220, 79 S.Ct. 269, 271, 3 L.Ed.2d 251 (1959).

■ Nevertheless, even though Indian sovereignty is prior to federal acknowledgment of Indian sovereignty historically and conceptually,

> the trend has been away from the idea of inherent Indian sovereignty as a bar to state jurisdiction and toward reliance on federal pre-emption. See Mescalero Apache Tribe v. Jones, 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114. The modern cases thus tend to avoid reliance on platonic notions of Indian sovereignty and to look instead to the applicable treaties and statutes which define the limits of state power.

*McClanahan, supra.* The preemption inquiry "is not dependent on mechanical or absolute conceptions of state or tribal sovereignty," but calls for "a particularized inquiry into the nature of the state, federal, and tribal interest at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law." *White Mountain v. Bracker,* 448 U.S. at 145, 100 S.Ct. at 2584.

■ In general, civil jurisdiction over disputes between reservation Indians lies exclusively in tribal court. *See generally Williams v. Lee, supra.* Although Congress provided a mechanism by which states could assume civil jurisdiction over reservation Indians, 25 U.S.C. §§ 1322–1326 (1988), South Dakota has never effectively availed itself of this procedure.[2] *Rosebud Sioux Tribe v. South Dakota,* 900 F.2d 1164, 1170–1171, 1174 (8th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2009, 114 L.Ed.2d 98 (1991). *See also State v. Spotted Horse,* 462 N.W.2d 463, 467 (S.D.1990).

Civil jurisdiction over disputes between reservation Indians and opposing parties who are *not* reservation Indians requires a more exacting infringement and preemption analysis. For example, this court has found concurrent state and tribal jurisdiction over divorce-related litigation between reservation Indians and spouses domiciled off the reservation, whether the off-reservation spouse is Indian or non-Indian. *Harris v. Young,* 473 N.W.2d 141, 144–146 (S.D.1991); *Wells v. Wells,* 451 N.W.2d 402, 405–406 (S.D.1990).

In contrast, assertions of state subject matter jurisdiction over contracts between reservation Indians and outsiders have generally been found either to infringe tribal sovereignty or to be preempted by federal law. "It is well settled that civil jurisdiction over activities of non-Indians concerning transactions taking place on Indian lands 'presumptively lies in the tribal courts unless affirmatively limited by a specific treaty provision or federal statute.'" *White Mountain Apache Tribe v. Smith Plumbing Co.,* 856 F.2d 1301, 1305 (9th Cir.1988) (quoting *Iowa Mut. Ins. Co. v. LaPlante,* 480 U.S. 9, 18, 107 S.Ct. 971, 977, 94 L.Ed.2d 10 (1987)) (citations omitted). " 'A tribe may regulate ... the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements.' " *Brendale v. Confederated Yakima Indian Nation,* 492 U.S. 408, 428, 109 S.Ct. 2994, 3007, 106 L.Ed.2d 343, *U.S. reh'g denied,* 492 U.S. 937, 110 S.Ct. 22, 106 L.Ed.2d 635 (1989) (quoting *Montana v. United States,* 450 U.S. 544, 565, 101 S.Ct. 1245, 1258, 67 L.Ed.2d 493 (1981)). *See also Babbitt Ford, Inc. v. Navajo Indian Tribe,* 710 F.2d 587, 592 (9th Cir.1983), *cert. denied,* 466 U.S. 926, 104 S.Ct. 1707, 80 L.Ed.2d 180 (1984).

■ We agree with the circuit court that it lacked subject matter jurisdiction over this dispute between a reservation school operated by and for Indians and Sage, who, though non-Indian, chose to enter into employment contracts with school for over a decade. We need not reach the question of whether such state jurisdiction would infringe on the "right of reservation Indians to make their own laws and be ruled by them," because we find that state jurisdic-

---

**2.** This is so despite the fact that this court once concluded that limited highway jurisdiction had been assumed by state under SDCL 1–1–18 to 1–21. *State v. Onihan,* 427 N.W.2d 365, 370 (S.D.1988).

tion in this case is preempted by federal law. The federal government provides school with $2.3 million of its annual operating budget under the authority of the Indian Self–Determination and Education Assistance Act, 25 USC §§ 450–450n (1988), the Tribally Controlled Schools Act of 1988, 25 U.S.C. §§ 2501–2511 (1988), and other federal statutes. Only $100,000 of school's annual budget comes from private donations. School is not funded by the State of South Dakota.

Among the congressional findings incorporated in the Indian Self–Determination and Education Assistance Act are the observations that "the Indian people will never surrender their desire to control their relationships both among themselves and with non-Indian governments, organizations, and persons," and that "parental and community control of the educational process is of crucial importance to the Indian people." 25 U.S.C. § 450(a)(2), (b)(3). The congressional declaration of policy at 25 U.S.C. § 450a speaks repeatedly of "self-determination," "maximum Indian participation," "establishment of a meaningful Indian self-determination policy," "effective and meaningful participation by the Indian people in the planning, conduct, and administration of ... programs and services," and "the development of strong and stable tribal governments." In addition, the Act and its accompanying administrative regulations at 25 CFR §§ 271.1–272.55, 274.1–275.4 (1990) set forth a comprehensive scheme for obtaining, disbursing and accounting for grants received by Indian schools through the Act. The United States Supreme Court examined the provisions of the Indian Self–Determination and Education Assistance Act in *Ramah Navajo School Bd. v. New Mexico Bureau of Revenue*, 458 U.S. 832, 102 S.Ct. 3394, 73 L.Ed.2d 1174 (1982), and concluded that "the comprehensive federal regulatory scheme and the express federal policy of encouraging tribal self-sufficiency in the area of education" precluded the imposition of a state tax on schools funded under the Act. 458 U.S. at 846–847, 102 S.Ct. at 3403. We find *Ramah Navajo* controlling and conclude under the same analysis that a suit in state court by a contract employee against a school receiving over 95% of its annual budget through the Indian Self–Determination and Education Assistance Act and other federal programs is preempted by federal law. *See also Marty Indian School Bd., Inc. v. South Dakota*, 824 F.2d 684 (8th Cir.1987).

Sage relies heavily on the fact that school is neither an individual Indian person nor an instrumentality of the tribal government, but a nonprofit organization incorporated under the laws of South Dakota. *See* SDCL ch. 47–22. Sage's main argument is that because of this fact school is no more an "Indian" than Sage himself and state court therefore has subject matter jurisdiction. This argument is unpersuasive for three reasons.

First, all 332 students of school are reservation Indians. Membership in the corporation is limited to enrolled members of the Rosebud Sioux Tribe with children in the school and any others they may elect. Members of the corporation democratically elect the seven voting members of the school board according to the reservation district they live in, with the exception of one ex officio school board member chosen from the Rosebud Sioux Tribal Education Committee. All current school board members are enrolled members of the tribe. Although school was incorporated as a nonprofit organization under South Dakota law in 1970, it was also authorized by the Rosebud Sioux Tribal Council in 1975 to contract with the federal Bureau of Indian Affairs and was granted a tribal charter by the tribal council in 1982.

Second, school is a "tribal organization" eligible to receive federal grants through the Indian Self–Determination and Education Assistance Act. 25 U.S.C. § 450b(1).[3] Since we conclude that state

3. 25 U.S.C. 450b(1) provides in part: "'tribal organization' means the recognized governing body of any Indian tribe; any legally established organization of Indians which is controlled, sanctioned, or chartered by such governing body or which is democratically elected by the adult members of the Indian community to be served by such organization and which

subject matter jurisdiction is preempted by this statute, this consideration is dispositive of Sage's argument about the Indian status of school.

Third, even if it were not dispositive and the Indian status of school under federal law remained ambiguous, "[a]mbiguities in federal law have been construed generously in order to comport with ... traditional notions of sovereignty and with the federal policy of encouraging tribal independence[.]" *White Mountain v. Bracker*, 448 U.S. at 143–144, 100 S.Ct. at 2584. *Accord McClanahan*, 411 U.S. at 174, 93 S.Ct. at 1263.

■ Sage also claims that his contract with school incorporates South Dakota statutes governing contracts and teacher employment, and that school's voluntary accreditation with the South Dakota Division of Elementary and Secondary Education requires its compliance with SDCL Title 13 on Education and the accompanying regulations at ARSD Title 24. *See* ARSD 24:03:02:01. Therefore, Sage reasons, school must have submitted to South Dakota's jurisdiction.

■ Even assuming, as Sage contends, that South Dakota substantive law would govern the case on the merits by stipulation of the parties, Sage is incorrect to conclude that state courts thereby exercise jurisdiction over his cause of action. A party may effectively submit to the *personal* jurisdiction of a court which would otherwise be without power to adjudicate its case, but *subject matter* jurisdiction or lack thereof exists independent of what any party may or may not do. No incorporation of state law by school, either unilaterally or in concert with Sage, can create state subject matter jurisdiction where it does not otherwise exist or defeat the exclusive subject matter jurisdiction of the tribe where it is independently established on the basis of infringement or preemption principles. "[S]ubject matter jurisdiction can neither be conferred on a court, nor denied to a court by the acts of the parties or the procedures they employ." *Applica-*

includes the maximum participation of Indians

*tion of Koch Exploration Co.*, 387 N.W.2d 530, 536 (S.D.1986) (citing *In re Marriage of Helm*, 271 N.W.2d 725, 727 (Ia.1978)).

We conclude that state court lacks subject matter jurisdiction over this cause of action. Affirmed.

MILLER, C.J., and WUEST and AMUNDSON, JJ., concur.

HENDERSON, J., concurs in result.

HENDERSON, Justice (concurring in result).

I concur in result only because, in my opinion, language in the majority writing waters down the integrity of the sovereignty concept.

Had this case been assigned to me, I would centralize and focus upon the educational process without benefit of general dicta. In *Marty Indian School Bd., Inc. v. South Dakota*, the Court said:

Removing from the Tribe and the Board the choice of how to spend the finite dollars provided by the federal government for school operations also necessarily affects the Tribe's ability to make its own rules and be governed by them, (citation omitted) and runs contrary to Congress' declaration that "parental and community control of the educational process is of crucial importance to the Indian people."

Essentially, I hew to the belief and would restrict the holding of this Court to be that Indian tribal courts must be left to determine disputes involving personnel matters in Indian schools.

The majority opinion paints with too broad a brush, citing *Harris v. Young* and *Wells v. Wells*, both of which, in my opinion, continue to dance with true recognition of the rights of Indian people in this state. We should zero in on the issue before us and not address, by implication, other jurisdictional problems. Endemic to the understanding of the applicability of tribal-state law is a foundational knowledge of the development of sovereignty accords. Until that is accomplished, tribal-state relations

in all phases of its activities[.]"

of states in the West shall flounder. A recent statement of our immediate past South Dakota Attorney General in this state's most widely distributed daily newspaper, the Sioux Falls Argus Leader, February 13, 1989, quoted him as saying "Indian reservations are a divisive system of government that have outlived their usefulness." Recently, in fact, in September, 1990, a Deputy State's Attorney of a county in South Dakota expressed that the contemporary Native American culture was "Godless, lawless, hopeless and jobless." This statement was widely printed in newspapers in this state. Yet, in an Associated Press article out in Los Angeles, California, on June 15, 1981, President Bush reaffirmed a "unique government-to-government relationship" with more than 500 American Indian tribes. He expressed that "these tribes sit in positions of dependent sovereignty along with the other governments that compose the family that is America." Bush expressed that "an office of self-governance has been established within the Interior Department." He concluded by expressing that "the White House will continue to interact with Indian Tribes on an intergovernmental basis."

For these reasons I concur in result.