#28738-a-DG
**2019 S.D. 33**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

TIMOTHY STATHIS,                                Plaintiff and Appellant,

     v.

MARTY INDIAN SCHOOL, a
South Dakota non-profit corporation;
ELK SOLDIER also known as GARY
DRAPEAU, SR.; GLENN DRAPEAU;
GALENA DRAPEAU; SARA W.
ZEPHIER; SARAH R. ZEPHIER;
STEPHANIE COURNOYER; JULIE
BLACKMOON-WRIGHT; and JOHN
AND/OR JANE DOES ONE (1)
THROUGH FIVE (5),                               Defendants and Appellees.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIRST JUDICIAL CIRCUIT
CHARLES MIX COUNTY, SOUTH DAKOTA
* * * *
THE HONORABLE BRUCE V. ANDERSON
Judge

* * * *

JAMES D. TAYLOR
Mitchell, South Dakota                          Attorney for plaintiff and
                                                appellant.


REBECCA L. KIDDER of
Fredericks, Peebles & Morgan, LLP
Rapid City, South Dakota                        Attorneys for defendants and
                                                appellees.

* * * *

ARGUED ON APRIL 30, 2019
OPINION FILED **06/19/19**

#28738

GILBERTSON, Chief Justice

[¶1.] Timothy Stathis was employed as the high school principal at the Marty Indian School (MIS) in Marty, South Dakota. In late 2017, a series of incidents between Stathis and members of the MIS school board and community of Marty led to the termination of Stathis's employment. Stathis sued MIS and other involved parties in state court for breach of contract, breach of settlement agreement, wrongful termination, libel, and slander and requested punitive damages. The circuit court dismissed Stathis's complaint on the grounds of tribal sovereign immunity, immunity of tribal officials and employees, federal preemption, and infringement of tribal sovereignty. We affirm the circuit court's dismissal solely on a lack of subject matter jurisdiction based on federal preemption.

## Facts and Procedural History

[¶2.] On May 8, 2017, Stathis entered into an employment contract with MIS to continue to serve as its high school principal. MIS is located in the town of Marty, South Dakota on the Yankton Sioux Indian Reservation. The school was chartered by the Yankton Sioux Tribe, a federally recognized Indian Tribe. The school operates under a constitution that was approved by the Yankton Sioux Tribal Business and Claims Committee on November 6, 2013. The constitution designates MIS as "a legal entity of the Yankton Sioux Tribe, from whom Marty Indian School, Inc. has been delegated authority to operate and maintain the Marty Indian School." It also states that MIS was "created for the purpose of maintaining and continually upgrading the educational process for the students of the Marty Indian School."

-1-

[¶3.] Stathis's contract with MIS stated that his term of employment would begin around August 1, 2017, and end around June 30, 2018. A provision of the contract entitled "SCHOOL LAW" provided that:

> The [MIS] School Board is an entity of the Yankton Sioux Tribe, and is not bound by the laws of the State of South Dakota. The By-laws and Policies and Procedures Manual of the School Board shall be binding and controlling on the parties and shall control the conduct of the operation of the school. Any matter by [sic] controlled by the By-laws and Policies and Procedures will be controlled by the laws of the State of South Dakota. If any ambiguity or question as to whether the laws of the State of South Dakota or the By-laws and Policies and Procedures Manual of the School Board is controlling shall arise, the By-law and Policies and Procedures of the School board shall be binding and controlling. The exceptions to South Dakota School law includes, but is not limited to, the following matters, to wit:
>
> Administrator or Supervisor Retirement, School Calendar, Continuing Contract and Tenure, and Conflict of Interest. Nothing herein shall be construed to constitute and [sic] acceptance by the School Board of the jurisdiction of South Dakota courts.

[¶4.] As part of his duties as principal, Stathis was required to administer school improvement grants issued by the Bureau of Indian Education. This involved granting monetary bonuses to faculty to incentivize improvement in both faculty and student performance. While employed at MIS, Stathis developed a set of criteria to assist in awarding these bonuses. These criteria and the awarding of bonuses became the subject of several disputes between Stathis, MIS faculty, the MIS school board, and members of the Marty community.

[¶5.] On November 15, 2017, opposition to Stathis's handling of monetary bonuses reached a boiling point. On that date, Elk Soldier (also known as Gary Drapeau, Sr.), a member of MIS faculty, arranged a sit-in demonstration at the MIS library for students and other community members to protest Stathis's actions. The

exact nature of the participants' grievances with Stathis is somewhat unclear from the record. As the gathering grew in size, members of the MIS school board, including Appellees Julia Blackmoon-Wright, Sarah W. Zephier, and Stephanie Cournoyer, began to arrive to assess the situation. Blackmoon-Wright sat in the front row of the gathering and stated, "I am a School Board Member, I am here to listen to what you want to say." Sarah W. Zephier, the president of the school board, then took control of the gathering.

[¶6.] President Zephier encouraged attendees of the gathering to voice their specific complaints regarding Stathis. This led to what Stathis characterizes as "an impromptu open and public meeting about Stathis between students, the entire Marty Indian School Board, members of the public, and Appellees John and/or Jane Does One (1) through Five (5)." The impromptu meeting continued for approximately two hours, at which point it was announced over the school's public address system that there would be an emergency executive session of the school board. The school board commenced a meeting in private, then called Stathis before the board to answer questions, and then excused Stathis from the meeting so the school board could meet in private.

[¶7.] Later that evening, Stathis received an email from the MIS superintendent stating that he had been suspended from his employment for ten days, beginning on November 16, 2017. Stathis later determined that he would not be paid during the term of his suspension. He filed a written grievance with the school board regarding his suspension without pay and the events of November 15-16, 2017. On November 29, 2017, after receipt of the grievance and several

discussions, the school board reinstated Stathis and stated that he would be repaid his previously withheld wages. Stathis returned to work on November 30, 2017.

[¶8.] On December 1, 2017, another incident involving Elk Soldier and Stathis occurred. That morning, Elk Soldier called Yankton Sioux Tribal Police to report that there had been a physical fight in the MIS school office between Stathis and another MIS staff member. When tribal police arrived at the scene, Stathis informed them that no fight had actually occurred. Elk Soldier later claimed that he had wrongly believed a fight had occurred between Stathis and another staff member. Later that day, both Elk Soldier and another MIS staff member, Appellee Galena Drapeau, submitted letters of resignation to the MIS superintendent. President Zephier then convened a meeting of the school board to discuss Stathis's employment. Stathis was not present. At the end of the meeting, the school board advised Stathis that his contract had been terminated.

[¶9.] Stathis claimed that the school board informed him that the remaining salary under his contract would be paid in full. On December 12, 2017, Stathis returned to the school and was given a check that school officials claimed to be the remaining amount owed to Stathis under his contract minus taxes and other withholdings. Shortly after receiving the check, however, Stathis was ordered by the MIS superintendent to surrender the check back to the school or a stop payment order would be entered. After Stathis was informed of this decision, a tribal police officer was called to the school and escorted Stathis from the MIS campus.

[¶10.] Stathis claims to have made repeated demands for the payment of the balance of his contract. On December 20, 2017, the school board met again and

decided to pay Stathis $1,500 as a complete settlement of the balance owed on Stathis's contract. The school board also opted to pay Stathis's salary for the two weeks he was suspended. On January 12, 2018, Stathis received a $1,500 settlement check and a $2,916 check for his salary during the two-week suspension. Stathis elected to not accept the $1,500 check. He later filed two written grievances with the school board, but claimed that both were unanswered.

[¶11.] Stathis sued the Appellees in this action in circuit court for breach of contract, breach of settlement agreement, wrongful termination, libel, and slander, and requested punitive damages arising from the termination of his employment contract with MIS. Appellees Elk Soldier (a.k.a. Gary Drapeau, Sr.), Glenn Drapeau, and Galena Drapeau were employees of MIS at the time of Stathis's employment. Appellees President Zephier, Sarah R. Zephier, Stephanie Cournoyer, and Julie Blackmoon-Wright were members of the MIS school board at the time of Stathis's employment. Appellees John and/or Jane Does one through five remain unknown, but are presumed to be employees, school board members, or students at MIS who were involved at the public meeting regarding Stathis. All named Appellees (defendants) are members of the Yankton Sioux Tribe.

[¶12.] Appellees moved to dismiss Stathis's complaint under SDCL 15-6-12(b)(1) (lack of subject matter jurisdiction), SDCL 15-6-12(b)(2) (lack of personal jurisdiction), SDCL 15-6-12(b)(5) (failure to state a claim on which relief can be granted), and SDCL 15-6-12(b)(6) (failure to join a party). The Appellees claimed the circuit court did not have jurisdiction to hear Stathis's claims on the basis of tribal sovereign immunity, immunity of tribal officials and employees, federal

preemption, and infringement of tribal sovereignty. A hearing was held on the motion on July 9, 2018. The circuit court granted the motion on the basis of tribal sovereign immunity, immunity of tribal officials and employees, federal preemption, and infringement of tribal sovereignty. The court declined to rule on the issue of failure to join a necessary and indispensable party under SDCL 15-6-12(b)(6). Stathis appeals, claiming the circuit court erred in granting the motion to dismiss on the above bases.

## Standard of Review

[¶13.]     "A motion to dismiss under SDCL 15-6-12(b) tests the legal sufficiency of the pleading, not the facts which support it." *Mordhorst v. Dakota Truck Underwriters & Risk Admin. Servs.*, 2016 S.D. 70, ¶ 8, 886 N.W.2d 322, 323 (quoting *Nygaard v. Sioux Valley Hosps. & Health Sys.*, 2007 S.D. 34, ¶ 9, 731 N.W.2d 184, 190). "Therefore, we review a circuit court's decision to grant such a motion de novo." *Id.* "For purposes of the pleading, the court must treat as true all facts properly pleaded in the complaint and resolve all doubts in favor of the pleader." *Id.* ¶ 8, 886 N.W.2d at 323-24 (quoting *Nygaard*, 2007 S.D. 34, ¶ 9, 731 N.W.2d at 190). However, "the court is free to ignore legal conclusions, unsupported conclusions, unwarranted inferences, and sweeping legal conclusions cast in the form of factual allegations." *Id.* ¶ 8, 886 N.W.2d at 324 (quoting *Nygaard*, 2007 S.D. 34, ¶ 9, 731 N.W.2d at 190). Jurisdictional issues are also reviewed de novo. *Hutterville Hutterian Brethren, Inc. v. Waldner*, 2010 S.D. 86, ¶ 18, 791 N.W.2d 169, 174.

## Analysis & Decision

[¶14.] Stathis's challenge to the circuit court's grant of the Appellees' motion to dismiss under SDCL 15-6-12(b)(1) raises an underlying question whether the circuit court, and therefore this Court, has subject matter jurisdiction to entertain the legal issues presented in this case. "Subject matter jurisdiction is a 'a court's competence to hear and determine cases of the general class to which proceedings in question belong; the power to deal with the general subject involved in the action;' and 'deals with the court's competence to hear a particular category of cases.'" *In re Heupel Family Revocable Tr.*, 2018 S.D. 46, ¶ 25, 914 N.W.2d 571, 578 (quoting *Sazama v. State ex rel. Muilenberg*, 2007 S.D. 17, ¶ 14, 729 N.W.2d 335, 342). "Subject matter jurisdiction is conferred solely by constitutional or statutory provisions." *Lippold v. Meade Cty. Bd. of Commr's*, 2018 S.D. 7, ¶ 17, 906 N.W.2d 917, 921-22 (quoting *Lake Hendricks Improvement Ass'n v. Brookings Cty. Planning & Zoning Comm'n*, 2016 S.D. 48, ¶ 15, 882 N.W.2d 307, 312). "[S]ubject matter jurisdiction can neither be conferred on a court, nor denied to a court by the acts of the parties or the procedures they employ." *Id.* (quoting *Cable v. Union Cty. Bd. of Cty. Comm'rs*, 2009 S.D. 59, ¶ 20, 769 N.W.2d 817, 825). "The test for determining jurisdiction is ordinarily the nature of the case, as made by the complaint, and the relief sought." *Id.* (quoting *State v. Phipps*, 406 N.W.2d 146, 148 (S.D. 1987)).

[¶15.] The nature of this case presents the question whether a non-Indian may sue a tribal entity, tribal employees, and tribal members in state court for contractual and other civil claims which arose from conduct that occurred on the reservation. "There are two distinct barriers to a state's assumption of jurisdiction

over reservation Indians: 'infringement' and 'preemption.'" *Sage v. Sicangu Oyate Ho, Inc.*, 473 N.W.2d 480, 481 (S.D. 1991). "Although 'either barrier, standing alone, can be a sufficient basis for holding state law inapplicable to activity undertaken on the reservation or by tribal members,' we consider them together because 'they are related.'" *Id.* (quoting *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 143, 100 S. Ct. 2578, 2583, 65 L. Ed. 2d 665 (1980)).

[¶16.]    We have described the concept of infringement as follows:

> Infringement refers to the original sovereignty of Indian tribes apart from the recognition of same by the federal government. "It must always be remembered that the various Indian tribes were once independent and sovereign nations, and that their claim to sovereignty long predates that of our own Government." *McClanahan v. Arizona Tax Comm'n*, 411 U.S. 164, 172, 93 S. Ct. 1257, 1262, 36 L. Ed. 2d 129 (1973). Therefore, even when an assertion of state jurisdiction over reservation Indians is not expressly preempted by federal law to the contrary, "the question has always been whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them." *Williams v. Lee*, 358 U.S. 217, 220, 79 S. Ct. 269, 271, 3 L. Ed. 2d 251 (1959).

*Id.* In contrast, "[t]he [federal] preemption inquiry 'is not dependent on mechanical or absolute conceptions of state or tribal sovereignty,' but calls for 'a particularized inquiry into the nature of the state, federal, and tribal interest at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law.'" *Id.* (quoting *Bracker*, 448 U.S. at 145, 100 S. Ct. at 2584).

[¶17.]    This Court has previously analyzed infringement and preemption principles in a context similar to the case at hand. In *Sage*, Sage, a non-Indian, was continuously employed as principal of the St. Francis Indian School, located on the

Rosebud Sioux Reservation, from 1979 to 1990. 473 N.W.2d at 481. When the school notified Sage of its final decision not to renew his contract for the 1990-91 school year, Sage filed a notice of appeal in state court pursuant to a provision of state law. *Id.* The school moved to dismiss the appeal on the ground that the circuit court lacked subject matter jurisdiction. *Id.* The circuit court granted the motion, and we affirmed. *Id.* at 481, 484.

[¶18.] In analyzing Sage's appeal, we stated that "assertions of state subject matter jurisdiction over contracts between reservation Indians and outsiders have generally been found either to infringe tribal sovereignty or to be preempted by federal law." *Id.* at 482. We further stated that "[i]t is well settled that civil jurisdiction over activities of non-Indians concerning transactions taking place on Indian lands presumptively lies in the tribal courts unless affirmatively limited by a specific treaty provision or federal statute." *Id. (*quoting *White Mountain Apache Tribe v. Smith Plumbing Co.*, 856 F.2d 1301, 1305 (9th Cir. 1988)). This presumption of tribal court jurisdiction is based on necessity. As part of its inherent sovereignty, a tribe must be able to "regulate the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." *Id.* (quoting *Brendale v. Confederated Yakima Indian Nation*, 492 U.S. 408, 428, 109 S. Ct. 2994, 3007, 106 L. Ed. 2d 343 (1989)); *see also Babbitt Ford, Inc. v. Navajo Indian Tribe*, 710 F.2d 587, 592 (9th Cir. 1983).

[¶19.] Here, the circuit court issued findings of fact and conclusions of law alongside its order granting the Appellees' motion to dismiss. The court concluded,

among other things, that it lacked jurisdiction over Stathis's complaint based on *both* the grounds of infringement and federal preemption. We agree with the circuit court's determination that it lacked jurisdiction on the ground of federal preemption. As only one ground is necessary to deprive this Court of subject matter jurisdiction, we decline to make a conclusion regarding infringement. *See Sage*, 473 N.W.2d at 482-83 (declining to reach the question of infringement because of finding of federal preemption).

[¶20.]     Article XXII of the South Dakota Constitution serves as a "legal principal[] that guide[s] our resolution" on issues of infringement of tribal sovereignty or federal preemption of state court jurisdiction. *See Risse v. Meeks*, 1998 S.D. 112, ¶ 11, 585 N.W.2d 875, 877. Article XXII provides, in part:

> That we, the people inhabiting the state of South Dakota, do agree and declare that we forever disclaim all right and title to the unappropriated public lands lying within the boundary of South Dakota, and to all lands lying within said limits owned or held by any Indian or Indian tribes; and that until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States; and said Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States[.]

S.D. Const. art. XXII.

[¶21.]     In addition to our state's constitution, federal statutes guide our resolution of this issue. Pertinent here are the Self-Determination Act, 25 U.S.C. § 5302 (2012), and the Tribally Controlled Schools Act, 25 U.S.C. § 2501 (2012). The Self-Determination Act provides that "a major national goal of the United States is to provide the quantity and quality of educational services and opportunities which will permit Indian children to compete and excel in the life areas of their choice, and

-10-

to achieve the measure of self-determination essential to their social and economic well-being." 25 U.S.C. § 5302(c) (2012). In pursuit of this goal, Congress has expressly stated that "parental and community control of the educational process is of crucial importance to the Indian people." 25 U.S.C. § 5301(b)(3) (2012). Both this Court and the Eighth Circuit Court of Appeals have recognized the importance of the Self-Determination Act in finding that cases involving Indian education on the reservation are preempted by federal law. *See Marty Indian Sch. Bd., Inc. v. State of S.D.*, 824 F.2d 684, 687 (8th Cir. 1987); *Sage,* 473 N.W.2d at 483.

[¶22.]     In addition, MIS receives federal funding to operate from the Bureau of Indian Education under the Tribally Controlled Schools Act. As part of that act, Congress recognized:

> that the Indian Self-Determination and Education Assistance Act [25 U.S.C. § 5301 et seq.], which was a product of the legitimate aspirations and a recognition of the inherent authority of Indian nations, was and is a crucial positive step toward tribal and community control and that the United States has an obligation to assure maximum Indian participation in the direction of educational services so as to render the persons administering such services and the services themselves more responsive to the needs and desires of Indian communities.

25 U.S.C. § 2501(a) (2012). Congress further recognized that,

> (1) true self-determination in any society of people is dependent upon an educational process that will ensure the development of qualified people to fulfill meaningful leadership roles;
>
> (2) that Indian people have special and unique educational needs, including the need for programs to meet the linguistic and cultural aspirations of Indian tribes and communities; . . .

25 U.S.C. § 2501(d)(1)-(2) (2012).

[¶23.]     Together, the Self-Determination Act and the Tribally Controlled Schools Act show a clear intent of Congress to preempt state court entanglement

into the education of Indians living on the reservation. MIS is a legal entity of the Yankton Sioux Tribe. According to its own constitution, MIS was chartered by the tribe to "maintain[] and continually upgrad[e] the educational process" for children living on the Yankton Sioux Reservation in the Marty community. The ability of MIS and the tribe to resolve disputes regarding employment contracts is inherently part of maintaining an educational process. State court action in this dispute is preempted by federal law, and therefore, the circuit court did not err in dismissing Stathis's complaint on that basis.

## Conclusion

[¶24.]     The circuit court lacked subject matter jurisdiction to hear Stathis's claims against MIS. We affirm the circuit court's dismissal of Stathis's claims on that basis alone. Because we find that the circuit court lacked subject matter jurisdiction, we may not reach a decision on the additional legal issues raised by Stathis, including tribal sovereign immunity and the immunity of tribal officials and employees.

[¶25.]     JENSEN and SALTER, Justices, and POWER, Circuit Court Judge, and WILBUR, Retired Justice, concur.

[¶26.]     POWER, Circuit Court Judge, sitting for KERN, Justice, disqualified.