2003 SD 21

**Loren POURIER, d/b/a Muddy Creek Oil and Gas, Inc., and Muddy Creek Oil and Gas, Inc., Plaintiffs and Appellants,**

v.

**SOUTH DAKOTA DEPARTMENT OF REVENUE, Defendant and Appellee.**

**No. 22221.**

Supreme Court of South Dakota.

Argued Nov. 19, 2002.

Decided Feb. 26, 2003.

Appellant's Rehearing Denied April 1, 2003.

Appellee's Rehearing Granted April 2, 2003, Solely on Issue One.

Vanya S. Hogen of Faegre & Benson, LLP, Minneapolis, MN, Frank Lawrence of Holland & Knight, LLP, Los Angeles, CA, for plaintiffs and appellants.

Lawrence E. Long, Attorney General, David D. Wiest, Assistant Attorney General, Pierre, SD, for defendant and appellee.

Mario Gonzalez, Pine Ridge, SD, Tracy A. Labin, Washington, DC, for Amicus Curiae, Oglala Sioux Tribe.

SABERS, Justice.

[¶ 1.] Loren Pourier is an enrolled member of the Oglala Sioux Tribe and a resident of the Pine Ridge Indian Reservation in South Dakota. Muddy Creek Oil and Gas, Inc., (Muddy Creek) is a South Dakota corporation whose sole shareholder and president is Pourier. The corporation's principal place of business is Pine Ridge. Muddy Creek purchased gas in Nebraska and trucked it to Pine Ridge for resale to consumers including reservation residents. The South Dakota Department of Revenue (Department) imposed a state motor fuel tax on Muddy Creek and refused Muddy Creek's refund request without a hearing. Muddy Creek appealed to the circuit court. After oral arguments, the circuit court entered an order remanding the case back to the Department for a full consideration of Muddy Creek's claims. The Department accepted the proposed decision against Muddy Creek from the Hearing Examiner and Pourier appealed that decision to the circuit court. The court affirmed the Department's ruling and Pourier appeals. We reverse and remand.

## FACTS

[¶ 2.] Muddy Creek is licensed by South Dakota as a fuel importer, exporter, marketer and distributor. It is also licensed by the Oglala Sioux Tribe to do business on the reservation, but does not hold a Federal Indian Trader license.

[¶ 3.] Muddy Creek purchases fuel at a terminal rack in Nebraska and trucks the fuel onto the reservation with its own tanker trucks. The corporation sells the fuel at its retail gas station on the reservation. It is apparently undisputed that approximately 90% of the purchasers are Indians who reside on the reservation.

[¶ 4.] South Dakota taxes motor fuel at in-state terminal racks and on importation.

SDCL 10–47B–5 and 10–47B–6. Since Muddy Creek bought its motor fuel at an out-of-state terminal rack, it was taxed as an importer and was liable for the tax at the point of importation, regardless of use of the fuel once it entered the state.[1] Muddy Creek has paid the tax under protest since 1995. Pourier testified that he did not pass the tax through to his customers, but evidence at the administrative hearing led the circuit court to the finding that the tax was passed on to the consumers. Specifically, sales to the federal government are exempted from the state motor fuel tax. According to Muddy Creek's own accounts and returns, the government paid 22 cents less per gallon than the pump price. If Muddy Creek were not passing the tax on to the consumer, no such reduction from the pump price for the federal government would have been necessary.

[¶ 5.] Muddy Creek claims it is entitled to a refund of approximately $940,000.00 for taxes paid since July 1995. The claim is based on the assertion that the State is taxing an Indian on an Indian reservation without explicit congressional authorization. The circuit court held that the Hayden–Cartwright Act of 1936 provided the necessary authorization for the imposition of the motor fuel tax. Muddy Creek appeals raising the following issues:

    1. Whether the Hayden–Cartwright Act expressly permits state taxation of motor fuel sales to tribal members by a Native American corporation operating on an Indian reservation.

    2. Whether Muddy Creek bears the legal incidence of the fuel tax.

    3. Whether the State's motor fuel taxation scheme deprived Muddy Creek of procedural due process.

    4. Whether State statutes of limitation bar a challenge to an illegal tax in this case.

### STANDARD OF REVIEW

    [¶ 6.] SDCL 1–26–36 provides our standard of review for administrative appeals. The statute

> requires us to give great weight to the findings and inferences made by the [agency] on factual questions. We examine agency findings in the same manner as the circuit court to decide whether they were clearly erroneous in light of all of the evidence. If after careful review of the entire record we are definitely and firmly convinced a mistake has been committed, only then will we reverse. Questions of law, of course, are fully reviewable.

*Sopko v. C & R Transfer Co., Inc.*, 1998 SD 8, ¶ 6, 575 N.W.2d 225, 228 (internal citations omitted). Questions requiring application of a legal standard are reviewed de novo. *Voeltz v. John Morrell & Co.*, 1997 SD 69, ¶ 9, 564 N.W.2d 315, 316.

    [¶ 7.] **1. WHETHER THE HAYDEN–CARTWRIGHT ACT EXPRESSLY PERMITS STATE TAXATION OF MOTOR FUEL SALES TO TRIBAL MEMBERS BY A NATIVE AMERICAN CORPORATION OPERATING ON AN INDIAN RESERVATION.**

    [¶ 8.] A state has no power to tax tribes, Indian reservation lands, or tribal members residing on Indian reservations unless there has been a cession of jurisdiction or other federal statute permitting the tax. *County of Yakima v.*

---

1.  SDCL 10–47B–6 provides:

    A fuel excise tax is imposed on all motor fuel or special fuel, except unblended ethyl alcohol, imported into this state in the bulk cargo area of any motor vehicle, vessel rail car, or trailer by any means other than through a terminal located in this state, upon its entry into this state[.]

*Confederated Tribes and Bands of the Yakima Indian Nation,* 502 U.S. 251, 258, 112 S.Ct. 683, 688, 116 L.Ed.2d 687, 697 (1992) (quoting *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 148, 93 S.Ct. 1267, 1270, 36 L.Ed.2d 114 (1973)). In order for the Court to find congressional authorization of such a tax, the Supreme Court has held that Congress must have "made its intention to do so unmistakably clear." *Yakima,* 502 U.S. at 258, 112 S.Ct. at 688, 116 L.Ed.2d at 697–698 (quoting *Montana v. Blackfeet Tribe,* 471 U.S. 759, 765, 105 S.Ct. 2399, 2403, 85 L.Ed.2d 753 (1985)) (citation omitted). *See also, Oklahoma Tax Com'n v. Sac and Fox Nation,* 508 U.S. 114, 128, 113 S.Ct. 1985, 1993, 124 L.Ed.2d 30, 43 (1993) (stating, "[a]bsent explicit congressional direction to the contrary, we presume against a State's having the jurisdiction to tax within Indian country"). Furthermore, "[w]hen we are faced with ... two possible constructions [of a statute], our choice between them must be dictated by a principle deeply rooted in [the United States Supreme] Court's Indian jurisprudence: '[s]tatutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit.'" *Yakima,* 502 U.S. at 269, 112 S.Ct. at 693, 116 L.Ed.2d at 704 (quoting, *Blackfeet Tribe,* 471 U.S. at 766, 105 S.Ct. at 2403, 85 L.Ed.2d at 753) (citation omitted). These presumptions and rules of construction form the necessary background to our consideration of any attempt by the State to assert taxation jurisdiction over Indians in Indian Country.

[¶ 9.] The statute upon which the Department of Revenue bases its claim of right to tax Muddy Creek is 4 U.S.C. § 104, otherwise known as the Hayden–Cartwright Act of 1936 (Act). Subsection (a) of the Act provides in part:

> All taxes levied by any State ... upon, with respect to, or measured by, sales, purchases, storage, or use of gasoline or other motor vehicle fuels may be levied, in the same manner and to the same extent, with respect to such fuels when sold by or through post exchanges, ship service stores, commissaries, filling stations, licensed traders, and other similar agencies, located on United States military or other reservations, when such fuels are not for the exclusive use of the United States.

[¶ 10.] The Department contends that by use of the phrases "filling stations," "other reservations" and "licensed traders," Congress manifested the requisite intent to allow the State to tax Indian proprietors on the Indian reservation. We disagree. The language of the statute does not make Congress' intention to allow such taxation "unmistakably clear." [2]

[¶ 11.] In two cases, the United States Supreme Court has declined to address the issue of whether the Act applies to Indians on Indian reservations. See *Oklahoma Tax Com'n v. Chickasaw Nation,* 515 U.S. 450, 457, 115 S.Ct. 2214, 2219, 132 L.Ed.2d 400, 408 (1995) (declining to address the issue because it was not raised below); *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980) (holding that the Act did not overcome the preemptive effect of federal regulation of tribal timber and declining to reach the question of whether the Act applies to Indian reservations at

---

**2.** The State of South Dakota argues persuasively that it is responsible for construction and maintenance of the major paved highways (U.S. Highway 18 and South Dakota Highway 407) on the Pine Ridge Reservation. State urges that this expense justifies the mo-

tor fuel tax on the reservation. We agree that the expense may justify the tax, but it does very little to make "unmistakably clear" the intention of Congress to permit taxation on Indian reservations.

all). However, this Court has addressed the issue of whether the Act applies to *non-Indians* operating on Indian reservations. In *Matter of State Motor Fuel Tax Liability of A.G.E. Corporation*, this Court stated,

> [w]e are of the opinion that the United States has granted to the states the right to exercise limited jurisdiction in taxing the use or sale of gasoline or other motor vehicle fuel within federal areas in exactly the same manner as if those areas did not exist, except in cases where the gasoline is to be used exclusively by the United States. Jurisdiction was extended to the states by Section 10 of the Hayden–Cartwright Act and in Section 1 of the Buck Act.

273 N.W.2d 737, 739 (1978) (internal citations omitted).

[¶ 12.] In *A.G.E.*, the Court faced the question whether a non-Indian contractor working on a reservation was subject to state taxation. The narrow holding was that the activities of a non-Indian on Indian land working pursuant to a federal contract were taxable. *Id.* That holding was based on a finding that the contractor did not fall within the federal instrumentality doctrine and that federal law did not preempt the tax. The Court was very clear that its analysis was based on the fact that the State was taxing a non-Indian. The Court also implied that the case would have been different had the taxed party been an Indian or a tribe. *A.G.E.*, 273 N.W.2d at 741. Finally, the language to which the Department refers was unnecessary to the ultimate holding, and was therefore dicta. We do not believe this case is controlling in the present fact situation. The Supreme Court has consistently distinguished between the power to tax non-Indians in Indian country and the ability to tax Indians in Indian country. The question whether the Act gives the State authority to tax an Indian in Indian country requires a different analysis than that employed in *A.G.E.* With regard to the difference between the taxation of a non-Indian in Indian country and an Indian in Indian country, the Supreme Court has held:

> [W]hen a State attempts to levy a tax directly on an Indian tribe or its members inside Indian country, rather than on non-Indians, we have employed, instead of a balancing inquiry, a more categorical approach: Absent cession of jurisdiction or other federal statutes permitting it, we have held, a State is without power to tax reservation lands and reservation Indians.

*Chickasaw Nation*, 515 U.S. at 458, 115 S.Ct. at 2220, 132 L.Ed.2d at 409 (citations and quotations omitted). Regardless of dicta in *A.G.E.*, whether the Act permits state motor fuel taxation of an Indian in Indian country is a question of first impression for this Court to be determined based on the presumptions and rules of construction promulgated by the Supreme Court.

[¶ 13.] The Department argues that a plain reading of the Act evinces Congress' clear intent to allow state motor fuel taxation of an Indian on an Indian reservation. We will begin with analysis of the language "other reservations." The Supreme Court has defined the term "reservation," stating that it is,

> [u]sed in the land law to describe any body of land, large or small, which Congress has reserved from sale for any purpose. It may be a military reservation, or an Indian reservation, or indeed, one for any purpose for which Congress has authority to provide, and, when Congress has once established a reservation, all tracts included within it remain a part of the reservation until separated therefrom by Congress.

*United States v. Celestine,* 215 U.S. 278, 285, 30 S.Ct. 93, 95, 54 L.Ed. 195 (1909). The Department argues that since the Supreme Court has defined the term "reservation" to include Indian reservations and since it is appropriate to presume Congress is familiar with precedent, we should interpret the Act to include Indian reservations. We cannot presume that Congress assumed "reservation" necessarily included an Indian reservation for the Court also stated in the same paragraph that, "a reservation is not necessarily 'Indian Country.'" *Id.* Furthermore, an Indian reservation has distinct characteristics unique from those of other federal government reservations. *See e.g., Goodman Oil Co. v. Idaho State Tax Com'n,* 136 Idaho 53, 28 P.3d 996, 1000 (2001), *cert denied,* 534 U.S. 1129, 122 S.Ct. 1068(Mem), 151 L.Ed.2d 971 (2002). For example, a national park has only a few of the characteristics of an Indian reservation. Furthermore, federal reservations, such as national parks and monuments and military posts, are created and maintained for the benefit of the federal government. Indian reservations were created for the benefit of the tribes. To assume that in this one instance Congress implicitly relied on this definition to abrogate Indian tax immunity is to ignore the context of the Court's definition and the requirement that Congress manifest its *clear* intent that the Indian in Indian country is taxable.

[¶ 14.] The Department relies on an opinion by the United States Attorney General to support its argument that "other reservations" was intended to include Indian reservations. The Department argues that the Attorney General concluded that Indian reservations were included within the Act and failure of Congress to amend the statute in light of that opinion is evidence of its intent to abrogate Indian tax immunity. However, this opinion dealt specifically with the question whether the Act included *national parks* under the term "other reservations." The Department points to the statement by the Attorney General that, "[i]t is true that some of the agencies which are expressly designated in Section 10 apparently are such as usually pertain to military, naval or Indian reservations, and that section does not expressly mention national parks." 38 U.S. Op.Atty.Gen. 522, 524 (1936). The argument that this Court should consider Congress' failure to amend the statute after the Attorney General's opinion as evidence of intent to include Indian reservations in the Act is tenuous. There is no analysis on the question whether Indian reservations fall within the Act. Further, the opinion mentions Indian reservations only in passing to ultimately find that national parks are included in the Act. An opinion by the Attorney General holding that national parks were included within the Act would not have put Congress on notice that Indian reservations were also included.

[¶ 15.] The Department next argues that the phrase "licensed trader" has become an Indian law term of art and that Congress knew that use of the term would authorize state motor fuel taxation within Indian Country. To support its assertion, the Department cites numerous federal cases using the term "licensed trader" in an Indian law context. It further argues that prior to this Act in 1936, Congress never used the term in a context other than Indian affairs. Even if we accept the proposition that the term "licensed trader" was an Indian law term of art in the federal courts, there is no sign that Congress treated it as such. Congress gave no indication in the statute that the term referred to Indian traders as opposed to those non-Indian traders who were required to obtain a license to sell fuel.

■ [¶ 16.] In 1940, the Solicitor of the Interior issued an opinion finding that Indian reservations were within the Act. Application of Federal and State Sales Taxes to Activities of Menominee Indian Mills, 57 InteriorDec 129 (1940). The Solicitor begins his analysis stating, "[i]t is not clear . . . whether the [Act's] reference to reservations includes Indian reservations." 57 InteriorDec at 138–139. Relying on three indications that the Act applied to Indian reservations, the Solicitor stated that although the indications were "slight," they were sufficient to find that Indian reservations were included. *Id.* The Solicitor's equivocation regarding whether the Act applied to Indian reservations and his admission that the "indications" that the Act applied to Indian reservations were "slight" are simply not enough to overcome the presumption that Indians on Indian land retain tax immunity. However, the circuit court felt that Congress' failure to amend the Act after this opinion was sufficient in part to find intent to abrogate the immunity. We disagree. We cannot find "unmistakably clear" congressional intent by negative implication. *United States v. Board of Commissioners*, 435 U.S. 110, 134–35, 98 S.Ct. 965, 981, 55 L.Ed.2d 148, 168 (1978).

[¶ 17.] The Act was a floor amendment to the Federal Aid Highway Act legislation of 1936. The language was added to the Act because of a "complaint in many parts of the country about the inability of the States to collect revenue on gasoline sold on Government reservations not for governmental use." 80 Cong.Rec. 6913 (statement by Senator Hayden). The legislative history of the Act contains no reference to either Indians, Indian reservations, or licensed Indian traders. This absence of comment on Indian taxation is significant since "some mention would normally be expected if such a sweeping change in the status of tribal government and reserva-

tion Indians had been contemplated by Congress." *Bryan v. Itasca County*, 426 U.S. 373, 381, 96 S.Ct. 2102, 2107, 48 L.Ed.2d 710. In fact, language found in the legislative history seems to indicate that Congress was primarily concerned with federal officials on federal reservations being immune from state taxation of motor fuel used for personal rather than governmental purposes. There is no indication Congress was concerned with tribal members being exempt from state fuel taxes. The Department cites a statement by a representative who was a member of the Conference Committee as proof of intent to tax Indians. However, that statement is more indicative of the committee's concern over federal officials or employees personally reaping the benefit of federal tax immunity:

In Post Exchange stores and on Government reservations, gasoline and motor vehicle fuel is being sold free from local taxes. The conferees believe that all local taxes should be collected except when the gasoline or motor vehicle fuels are for the exclusive use of the United States. *The privilege should not be extended to officials or employees when not in the actual discharge of their official duties.* The conferees agreed, therefore, to provide for the collection of all taxes levied by any State, Territory or District upon the sale of gasoline or other motor vehicle fuel, except when for the exclusive use of the United States.

80 Cong.Rec. 8701 (1936) (emphasis supplied). Contrary to the Department's assertion, this language seems to refer more to government officials than Indian tribes or tribal members. Even if it does not, this language is far from sufficient to show clear legislative intent to abrogate Indian tax immunity. The vague language of the Act, and Congress' failure to even address

Indian tax immunity either in the Act or the legislative history, lead us to the conclusion that it failed to manifest unmistakably clear intent to abrogate Indian tax immunity.[3] The circuit court's decision on this issue is reversed.

### [¶ 18.] 2. WHETHER MUDDY CREEK BEARS THE LEGAL INCIDENCE OF THE TAX.

[¶ 19.] Having established that the State does not have authority to impose its motor fuel tax upon Indians residing in Indian country, the question is, who is entitled to the refund of the illegally collected tax. Central to this inquiry is the question of who bears the legal incidence of the tax; Muddy Creek, or the consumers residing on the Pine Ridge Indian Reservation. The Department claims that because the legal incidence of the fuel tax is statutorily imposed upon the consumer, and because Muddy Creek passed the tax on to the consumers, Muddy Creek is not entitled to a refund.[4] SDCL 10–47B–42 (providing, "the legal incidence of the tax falls upon the consumer of the fuel for the privilege of operating vehicles on the roads and highways of the state"). Muddy Creek argues in response that although the statute purports to impose the legal incidence of the tax on the consumer, in reality, the incidence falls upon Muddy Creek, as a marketer and importer. It further argues that 1) it did not pass the tax to the consumer and 2) even if it did,

that pass-through is irrelevant to determining whether Muddy Creek can receive a refund. In this respect, it is interesting to note that Muddy Creek claims that the refund would be used for the benefit of tribal members. According to Pourier, by investing the refund in his business, he would be spurring economic development thereby improving life for tribal members residing on the reservation.

[¶ 20.] If the legal incidence of a tax falls upon a Tribe or its members for sales made in Indian country, the tax is unenforceable unless there is clear congressional authorization for the tax. *Chickasaw*, 515 U.S. at 459, 115 S.Ct. at 2220, 132 L.Ed.2d at 409. However, if the legal incidence falls upon non-Indians, "no categorical bar prevents enforcement of the tax; if the balance of federal, state and tribal interests favors the State, and federal law is not to the contrary, the State may impose its levy." *Chickasaw*, 515 U.S. at 459, 115 S.Ct. at 2220, 132 L.Ed.2d at 409 (citing *Washington v. Confederated Tribes of Colville Reservation*, 447 U.S. 134, 154–157, 100 S.Ct. 2069, 2081–2083, 65 L.Ed.2d 10 (1980)).

[¶ 21.] The Department claims that Muddy Creek cannot meet the threshold requirement of being either the Tribe or an enrolled member of the Tribe because as a corporation, it cannot have the racial identity necessary to fall within the *Chickasaw* rule. In support of this

---

3. This Court does not stand alone in coming to this conclusion. Three courts have rejected essentially the same arguments advanced by the State in this case. *See, Goodman Oil Co.*, 136 Idaho 53, 28 P.3d 996; *Coeur D'Alene Tribe v. Hammond*, 224 F.Supp.2d 1264 (D.Idaho 2002). The third case, *Prairie Band Potawatomi Nation v. Richards*, 2003 WL 136197, 241 F.Supp.2d 1295 (D.Kan.2003), was handed down subsequent to oral arguments in this case.

4. The Department does not appear to contest the fact that the incidence of the tax falls upon either the Tribe or its members. Rather, the Department argues that because Muddy Creek does not bear the legal incidence, it, as opposed to the consumers, is not entitled to a refund. This is significant because if the State concedes that the incidence falls upon the Tribe or its members, the per se presumption against taxation applies because the majority of consumers are members of the tribe residing on the Indian reservation.

argument, the Department relies on *Baraga Products, Inc. v. Commissioner of Revenue,* 971 F.Supp. 294, 296–297 (W.D.Mich. 1997). *Baraga* held that a corporation formed under state law and owned by an enrolled tribal member, such as Muddy Creek, was not an enrolled member of the tribe as required by *Chickasaw.* We disagree and hold that a corporation owned by the tribe or an enrolled tribal member residing on the Indian reservation and doing business on the reservation for the benefit of reservation Indians is an enrolled member for the purpose of protecting tax immunity.

[¶ 22.] The case principally relied upon by the Department in asserting that Muddy Creek lacks the "racial identity" necessary to allow it immunity from tax is unpersuasive. Admittedly, courts have fairly consistently stated that a corporation lacks racial identity because it is a separate and distinct legal entity. However, courts have also consistently been willing to go beyond the corporate fiction to reach the people behind the corporate veil. Behind incorporation, there remain individuals who maintain a distinct racial identity that protects them from some government actions. This Court has held that incorporation of a not for profit organization under state law does not terminate a tribal entity's Indian status. *Sage v. Sicangu Oyate Ho, Inc.,* 473 N.W.2d 480 (S.D.1991). In *Sage,* this Court went beyond the corporate shield and looked at the characteristics of the entity to find that the state court had no subject matter jurisdiction over a school operating on the Rosebud Reservation. Specifically, the Court looked to factors such as people who were members in the corporation, the purposes the corporation served and the fact that it was granted a tribal charter by the Tribal Council. *Sage,* 473 N.W.2d at 483–484. Here, Muddy Creek's sole shareholder is an enrolled member of the Tribe, the business is operated on the reservation, the vast majority of its customers are Indians residing on the reservation, and it is licensed by the Tribe to do business on the reservation.

[¶ 23.] The United States Supreme Court has stated that a corporation has no racial identity and cannot be the target of alleged discrimination. *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). Despite this language, the Court found an individual plaintiff within the corporation had standing and therefore never resolved the question of whether the corporation itself had standing. Cases handed down from federal courts since that decision have treated the language in *Arlington* as dicta and have permitted corporations to assert claims under § 1981 based on the fact that a corporation was owned or managed by persons with an identifiable racial identity. *Inash Corporation v. American Dairy Queen Corp.,* 1990 WL 622095 (S.D.Ga. 1990) (citing *Howard Security Services, Inc. v. Johns Hopkins Hospital,* 516 F.Supp. 508, 513 (D.Md.1981); *T & S Service Associates Inc. v. Crenson,* 666 F.2d 722, 725 (1stCir.1981); *Organization of Minority Vendors, Inc. v. Illinois Central Gulf RR,* 579 F.Supp. 574, 588 (N.D.Ill. 1983); *Rosales v. AT & T Information Systems, Inc.,* 702 F.Supp. 1489, 1494 (D.Colo.1988)).

[¶ 24.] Furthermore, Congress has recognized the fact that there is such a thing as an "Indian corporation." The Indian Business Development Program is legislation created to "establish and expand profit-making Indian-owned economic enterprises." 25 U.S.C. § 1521. Under federal regulations, the only persons or entities that may apply for funds from this program are, "Indians, Indian tribes, Indian partnerships, corporations, or cooperative

associations authorized to do business under State, Federal, or Tribal law." 25 C.F.R. § 286.3. The regulations go on to require that the "Indian ownership must actively participate in the management and operation of the economic enterprise" and that corporations must be at least 51% owned by eligible Indians or Indian Tribes. *Id.* We agree with this recognition by courts and Congress that the identity of those owning and operating a business is pertinent to classification of the entity itself.

[¶ 25.] Policy considerations also weigh heavily in favor of treating Muddy Creek as a tribal member. Congress' primary objective in Indian law for several decades has been to encourage tribal economic independence and development. By finding that incorporation under state law deprives a business of its Indian identity, we would force economic developers on reservations to forgo the benefits of incorporation in order to maintain their guaranteed protections under federal Indian law. This could hinder economic development. This is particularly unwarranted in the instant case because the Pine Ridge Reservation is the poorest in the country. We therefore reject the Department's contention that Muddy Creek fails the first inquiry under *Chickasaw.*

[¶ 26.] The next inquiry focuses on whether Muddy Creek bears the legal incidence of the motor fuel tax. The Supreme Court has held that in the absence of dispositive language in the state taxing statute that either identifies who bears the legal incidence of the tax, or a "pass through" provision requiring retailers and distributors to pass the tax to consumers, then "the question is one of 'fair interpretation of the taxing statute as written and applied.'" *Chickasaw,* 515 U.S. at 461, 115 S.Ct. at 2221, 132 L.Ed.2d at 411 (quoting *California Bd. of Equalization v.*

*Chemehuevi Tribe,* 474 U.S. 9, 11, 106 S.Ct. 289, 290, 88 L.Ed.2d 9 (1985)). The Department argues that this statement by the Court provides us with a rule that if the state legislature specifically designates the party upon whom the legal incidence rests, that designation is dispositive and there is no need for inquiry into the statutory structure to determine upon whom it rests. Here, the South Dakota Legislature has provided that the legal incidence of the tax rests upon the consumer. SDCL 10–47B–42 provides, "the legal incidence of the tax falls upon the consumer of the fuel for the privilege of operating vehicles on the roads and highways of the state."

[¶ 27.] Although one may question the wisdom of permitting a state to determine the entity who bears the legal incidence of a tax by merely making cosmetic changes to a statute, that is what the Court in *Chickasaw* did. The Court found that the legal incidence of Oklahoma's tax fell upon the retailer based upon its analysis of the taxation scheme, but stated, "Oklahoma could accomplish what it here seeks by declaring the tax to fall on the consumer and directing the Tribe to collect and remit the levy." *Chickasaw,* 515 U.S. at 460, 115 S.Ct. at 2221, 132 L.Ed.2d at 410. Thus, despite indications in the statute that it may be the marketer who is ultimately responsible to pay the tax, the legal incidence falls upon the consumer.

[¶ 28.] The conclusion that the legal incidence of the tax falls upon the consumer does not change our analysis regarding whether the Department may levy this tax. First, the record supports, and the Department apparently does not dispute, that the majority of Muddy Creek's consumers are enrolled members of the Oglala Sioux Tribe residing on the Reservation.

[¶ 29.] Second, Muddy Creek maintains standing to bring this suit based on the

fact that regardless of where the legal incidence falls, Muddy Creek was liable for the tax as it was required to prepay it, even though it passed the tax on to its consumers. As the Supreme Court noted in *Bacchus,* although Muddy Creek may pass the tax on to its consumers, it still must prepay the tax to the State in order to obtain the gasoline. *Bacchus Imports Ltd. v. Dias,* 468 U.S. 263, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984). Although *Bacchus* dealt with whether a state tax exemption violated the Commerce Clause, we believe the same standing analysis applies here. Muddy Creek was civilly and criminally liable for the taxes and was wholly responsible for prepayment and it has standing to dispute the legality of the tax. *See* SDCL 10–47B–41; SDCL 10–47B–75; SDCL 10–47B–187.

[¶ 30.] Finally, the record indicates that Muddy Creek paid South Dakota motor fuel taxes on fuel it purchased for its transport trucks to haul fuel to the filling station at Pine Ridge. To the extent that Muddy Creek was a "consumer" of fuel for use on the reservation, it is entitled to a refund of the South Dakota motor fuel taxes it paid.

[¶ 31.] Since Muddy Creek does not bear the legal incidence of the tax on the fuel it sold to consumers, by statute, it is therefore not entitled to a refund of all the taxes it has paid since 1995. However, the State is also not entitled to retain this illegally collected tax. The proper parties, namely, Muddy Creek's consumers who were enrolled members of the Oglala Sioux Tribe, are entitled to the bulk of refund.

[¶ 32.] **3. WHETHER THE STATE'S MOTOR FUEL TAXATION SCHEME DEPRIVED MUDDY CREEK OF PROCEDURAL DUE PROCESS.**

■ [¶ 33.] Muddy Creek argues that it was denied procedural due process be-

cause the State did not provide for or allow for a refund claim by Muddy Creek based on the invalidity of the tax. Our holding that Muddy Creek, as a marketer, is not entitled to the refund, partially disposes of this issue because the South Dakota motor fuel taxation scheme allows for a refund claim by a consumer based on the invalidity of the tax. Since Muddy Creek does not bear the legal incidence of the tax as a marketer, it was not the proper party to obtain the refund, except as to the fuel it purchased for its own use on the reservation.

[¶ 34.] South Dakota's refund statutes allow for a refund to the party who uses the motor fuel, in this case, the consumer, in three instances: 1) when the user is exempt; 2) when the fuel is used off road and 3) when the tax cannot be passed on to the user. SDCL 10–47B–42. Of particular importance in this case is SDCL 10–47B–131.2 which provides:

> A consumer of motor fuel ... may apply for and obtain a refund of fuel taxes imposed and paid to this state, if a state or federal court of final appeals finds that taxation of the purchase or use [of] the fuel is preempted by federal law or unconstitutional.

This statute allows for a refund of illegally collected taxes by the individual or entity that bears the legal incidence of the tax. Since the taxation scheme provides for compensation for the person upon whom the legal incidence falls, there is no due process violation against Muddy Creek as a marketer.

[¶ 35.] **4. WHETHER STATE STATUTES OF LIMITATION BAR A CHALLENGE TO AN ILLEGAL TAX IN THIS CASE.**

■ [¶ 36.] Muddy Creek raises the issue whether state statutes of limitation

operate to prevent refund of an illegal tax. We address the issue because this is an illegal tax and there are reservation Indian consumers who can claim the refund.

[¶ 37.] When the Department imposed the state motor fuel tax upon gasoline sold by an Indian retailer on an Indian reservation to members of the tribe residing on the reservation, it exceeded its jurisdictional and legal boundaries. This Court has held that if property is outside of the taxing district or it is exempt from taxation, statutes of limitation are rendered inoperative. *Hough v. Perkins County*, 72 S.D. 236, 32 N.W.2d 632, 633–634 (1948). Because the State exceeded its authority in imposing this tax, the limitation periods imposed by the motor fuel taxation scheme are inapplicable in this case.

[¶ 38.] We agree with the Department that States are permitted to impose reasonable procedural limitations upon the refund of an invalid tax. We also agree that the underlying justification for such limitations is to protect the "government's strong interest in financial stability" and the State's ability to engage in "sound fiscal planning." *McKesson Corp. v. Division of Alcoholic Beverages*, 496 U.S. 18, 44, 110 S.Ct. 2238, 2254, 110 L.Ed.2d 17, 41. However, those justifications are simply not present in this case. The Department was aware as early as 1994 that Muddy Creek intended to contest these taxes and was presumably aware of the possibility that the taxes might be invalid. The State could have fully prepared for the contingency that it would be liable for a refund of the taxes it was illegally imposing. Under the facts of this case, we hold that the state statutes of limitation regarding refunds for motor fuel taxation are inapplicable. Therefore, we reverse and remand with instructions for the trial court to direct the Department to:

1) Determine the correct amount of the invalid tax (refund) that applies to purchases by Muddy Creek for its use on the reservation.

2) Determine, upon proper application, the correct amount of the invalid tax (refund) that applies to purchases by reservation Indian consumers.

3) Determine related questions, such as prejudgment interest.

[¶ 39.] RUSCH, Circuit Judge, concurs.

[¶ 40.] GILBERTSON, Chief Justice, concurs specially.

[¶ 41.] KONENKAMP, Justice, and AMUNDSON, Retired Justice, concur in part and dissent in part.

[¶ 42.] RUSCH, Circuit Judge, sitting for ZINTER, Justice, disqualified.

[¶ 43.] MEIERHENRY, Justice, not having been a member of the Court at the time this action was submitted to the Court, did not participate.

GILBERTSON, Chief Justice (concurring specially).

[¶ 44.] I join in the Court's opinion. I write specially only to address remand procedures which this Court's decision now authorizes.

[¶ 45.] One hundred years ago, the United States Supreme Court struck down the first attempt by the State of South Dakota to levy a tax on personal property owed by Indians who resided in Indian country. *United States v. Rickert*, 188 U.S. 432, 23 S.Ct. 478, 47 L.Ed. 532 (1903). However, the Court merely struck down the attempted taxation and the subject of refunds was never addressed.

[¶ 46.] More recent taxation cases between the State and various opponents to its taxation attempts have dealt with the refund issue. Generally, state statutes of limitation such as SDCL 10–47B–141,

seeking to limit the time for application of refunds, have not fared well in this context. In *United States ex rel. Cheyenne River Sioux Tribe v. South Dakota*, 105 F.3d 1552 (8thCir.1997), *cert. denied*, 522 U.S. 981, 118 S.Ct. 441, 139 L.Ed.2d 378 (1997), the district court was reversed for not allowing a monetary refund of motor vehicle excise taxes paid by tribal members. The Eighth Circuit reasoned that a refund was appropriate to tribal members if paid under duress when the state's tax was determined to be invalid " 'because it [is] beyond the State's power to impose' or 'because the taxpayers were absolutely immune from the tax.' " *Id.* at 1560 (citing *McKesson Corp. v. Division of Alcoholic Beverages and Tobacco*, 496 U.S. 18, 39, 110 S.Ct. 2238, 2251–52, 110 L.Ed.2d 17 (1990)) (additional citations omitted). Thus, " 'the State must 'undo' the unlawful deprivation by refunding the tax previously paid under duress.' " *Id.*

[¶ 47.] The United States Supreme Court had previously held in *McKesson* that if a taxpayer was absolutely immune from a tax, it would be a violation of the Fourteenth Amendment to allow the State to retain taxes previously paid under duress without any obligation to refund such unlawfully collected taxes. *McKesson*, 496 U.S. 18, 39, 110 S.Ct. 2238, 2251, 110 L.Ed.2d 17 (1990). In reliance upon *McKesson*, the *Cheyenne* Court further refined its ruling by stating that:

> [t]axes that are voluntarily paid because of mistake of law cannot be recovered back, but taxes paid under duress or coercion are recoverable, and state refund procedures do not limit such recovery.

*Id.* at 1561 (internal citations omitted).

[¶ 48.] The refund issue again arose in *United States ex rel. Cheyenne River Sioux Tribe v. South Dakota*, 102 F.Supp.2d 1166(DSD), which was the remand proceeding from the *Cheyenne* Eighth Circuit case. Therein, the district court concluded the excise taxes were paid " 'under duress or coercion' " as the "State did not provide a pre-deprivation procedure to challenge the tax and failure to pay the tax subjected tribal members to criminal penalties." *Id.* at 1172. The district court cast aside the State's argument that SDCL 10–59–19 governed the time for allowable refunds in favor of the longer 28 U.S.C. § 2415(a). *Id.* at 1174. However, that decision hinged on the fact the United States was the plaintiff rather than individual Indians seeking refunds. While the door was not completely closed precluding the application of state statutes of limitation, the district court held that state statutes of limitation may apply to a federal claim which is analogous to a state cause of action only if there is no applicable federal statutes of limitation and the state statutes of limitation "would not be inconsistent with underlying federal policies." *Id.* (citing *Oneida County v. Oneida Indian Nation*, 470 U.S. 226, 240–42, 105 S.Ct. 1245, 1254–56, 84 L.Ed.2d 169 (1985)). Therein, the Court applied 28 U.S.C. § 2415(a) because it concluded the State would be unjustly enriched if it were allowed to keep the illegal collection of the excise tax from tribal members. *Cheyenne River*, 102 F.Supp.2d at 1174. *See also United States ex rel. Standing Rock Sioux Tribe v. Janklow*, 103 F.Supp.2d 1146, 1155 (D.S.D. 2000).

[¶ 49.] Thus upon remand, the trial court in this case should determine whether those tribal members [5] paid under coercion and duress and thus are entitled to be

---

**5.** The immunity from tax does not extend to Indians who are members of a different tribe.

*Cheyenne River*, 105 F.3d at 1559.

considered for a refund. That will also affect whether SDCL 10–47B–131.2 can stand as a valid statute of limitation. If those legal matters are resolved in favor of the tribal members, the trial court should proceed to resolve evidentiary matters concerning the individual claims.

KONENKAMP, Justice (concurring in part and dissenting in part).

[¶ 50.] I agree that SDCL 10–47B–131.2 permits "consumers" to apply for and obtain a refund of motor fuel taxes if a court finds, as we have, that taxation is preempted by federal law. Consumer claimants have not yet made a claim, of course, and, if they do, the question of the statute of limitations should be decided then. Today's decision impugns the wise principle that courts must await whatever controversies may arise and decline to reach disputes not before them. The only claim before us is the one sought by Muddy Creek.

[¶ 51.] All refund claims that Muddy Creek submitted before December 17, 1997 are untimely. SDCL 10–47B–141 limits the time a claimant can obtain a motor fuel tax refund to fifteen months:

> Any claim for refund of motor fuel or special fuel tax shall be received by the department within fifteen months of the date the fuel was originally purchased in order to be accepted for refund. Fuel purchased more than fifteen months from the date the claim is received is forever barred from refund eligibility.

The only valid refund Muddy Creek is entitled to is the one for tax paid on its own use of motor fuel on the reservation for the period of December 17, 1997 through December 1999. That period is the one for which Muddy Creek made a timely demand. All prior claims are foreclosed in accord with SDCL 10–47B–141 and are "forever barred from refund eligibility."

[¶ 52.] Nonetheless, the Court bypasses this statute, throwing open the State's treasury not only to Muddy Creek's claims but to all claims to be made in the future by consumers, without regard to any time limitation. This Court has neither the right nor the justification to initiate its own administrative proceedings on behalf of these consumers in order to prejudge the future timeliness of their claims for tax relief against the State. The controversy is not ripe for decision because we do not know how far back claims will be made by consumers or how long in the future the right to make those claims will or should remain open.

[¶ 53.] The Court relies on the decision of *Hough v. Perkins County*, 72 S.D. 236, 32 N.W.2d 632, 633 (1948) to declare that South Dakota's fifteen month limitations period for seeking a refund on motor fuel tax is "inoperative" and thus "the limitation periods imposed by the motor fuel taxation scheme are inapplicable in this case." But, for the record, *Hough* had nothing to do with tax refunds. And that case upheld the statute of limitations. At best, *Hough* only stands for the proposition that certain defects in a tax deed are jurisdictional against which a statute of limitations is necessarily inoperative. *See also Cornelius (Lynch, Intervener) v. Ferguson*, 23 S.D. 187, 121 N.W. 91, 93. *Hough* follows a long line of South Dakota cases standing for the rule that persons cannot be deprived of their real property through the sale of a tax deed if the defects in the process of obtaining the deed are so serious as to deprive owners of their property without due process of law. Here, with respect to refunds on motor fuel tax, South Dakota taxpayers have not been deprived of due process. They have

a right to seek a refund within a reasonable time.

[¶ 54.] All in all, the holding in *Hough* is very different from today's fiat declaring that the State cannot set a reasonable limit on a motor fuel tax refund claim. On the contrary, the United States Supreme Court has specifically authorized reasonable procedural limitations, including "relatively short statutes of limitation" applicable to tax refund claims. *McKesson Corp. v. Division of Alcoholic Beverages,* 496 U.S. 18, 45, 110 S.Ct. 2238, 110 L.Ed.2d 17 (1990). The Supreme Court acknowledged this vital issue in dealing with tax refunds, endorsing a State's "exceedingly strong interest in financial stability." *Id.* at 37, 110 S.Ct. 2238. Granted, there is an element of injustice in cutting off the right to seek tax refunds for taxes illegally collected. But statutes of limitations always cut off what may otherwise be just claims. They balance the right to redress against the specter of endless liability. In tax refund cases, to deny such limitations would devastate the State's budgetary planning process.

[¶ 55.] Since the issue of future consumer claims was never briefed or decided at any level in these proceedings, the matter is simply not appropriate for decision. As Learned Hand would counsel, a court should move cautiously before taking so drastic a step as to prejudge a controversy not before it. Therefore, I concur on Issues 1 and 2, but dissent on Issues 3 and 4.

[¶ 56.] AMUNDSON, Retired Justice, joins this special writing.